UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Crim. No. 16-10258-ADB |
| v. | ) | |
| | ) | |
| FRANCIS P. SALEMME and | ) | |
| PAUL M. WEADICK, | ) | |
| | ) | |
| Defendants. | ) | |

GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE RELATIVE TO STATEMENTS OF DEFENDANT SALEMME

The United States hereby moves *in limine* for a pretrial ruling allowing the admission of certain statements made by the Defendant Francis P. Salemme (Defendant) in a written plea agreement, during a plea colloquy and finally, during an interview incident to his expected testimony in a federal trial. In support of its motion, the Government avers that such statements are admissible as against the Defendant in that they are statements of an opposing party offered against an opposing party and, were made outside any grant of immunity or proffer agreement. FED. R. EVID. 801(d)(2).

**FACTUAL BACKGROUND FOR MOTION**

On October 25, 1994, a federal grand jury indicted Robert P. Deluca. That indictment remained under seal until a superseding indictment was unsealed on January 10, 1995 that added several additional defendants including the Defendant Salemme. A warrant issued for the Defendant's arrest. In August of 1995, agents of the Federal Bureau of Investigation (FBI) learned the Defendant was living in Florida. The FBI arrested the Defendant and he was returned to the District of Massachusetts. Eventually, the grand jury returned a Fourth Superseding Indictment that charged *inter alia*, Conspiracy to participate in the activities of a racketeering

1

enterprise (18 U.S.C. 1962(d) including predicate acts of murder, Extortion (18 U.S.C. § 1951) and illegal gambling (18 U.S.C. § 1955).

On September 28, 1999, the defendant, through counsel, agreed to proffer information to the Government relative to criminal activities purportedly engaged in by agents of the FBI. The interviews with the Defendant occurred pursuant to the terms of a standard proffer letter providing for limited use immunity and it read in pertinent part,

> No statements made or other information provided by Mr. Salemme will be used directly against him, except for the purposes of cross-examination and/or impeachment should he offer in any proceeding statements or information different from statements made or information provided by him during the proffer, *or* in a prosecution of Mr. Salemme based on false statements made or false information provided during the proffer.

*Proffer letter to Anthony Cardinale* ¶2 dated 09/28/1999 (*emphasis added*) Attachment A.

The Defendant personally executed the proffer letter during a November 1, 1999 meeting. Subsequently, the Defendant engaged in numerous interviews. During the course of these proffers, the Defendant admitted that he was a "made member" of the New England La Cosa Nostra (NELCN), a *capo regime* for that same criminal organization, and ultimately that he served in the position of Boss. (*FBI 302 of FBI Inspector Bald dated 11/15/1999* pg. 8-9 and *FBI 302 of Special Agent Kristen Koch dated 07/18/2013 pg. 2*). The Defendant told investigators that in March of 1990, NELCN Boss Raymond J. Patriarca was indicted. Shortly thereafter, the Defendant and NELCN *capo* Robert Deluca decided to take over and run "the numbers operation" in Boston. *Id*. In addition to the numbers business, the Defendant "collected rent" from bookmakers and strip club owners. (*Report of Massachusetts State Police Lieutenant John Tutungian* 11/2/1999 ¶ 17). According to the Defendant, meetings between he,

Steven Flemmi and Deluca related to their criminal activities occurred in the Brookline, Massachusetts area. Deluca, Flemmi and he would meet near the Busy Bee Diner. Their criminal related conversations would occur when they walked around the Massachusetts Institute of Technology (MIT) baseball field. *Id*. at 11.

During a November 2, 1999 proffer, the Defendant admitted to knowing the victim, Steven DiSarro, stating that he had met him when DiSarro was the owner of a Boston restaurant, the Scotch and Sirloin. (*Tutungian Report* 11/2/1999 ¶ 25). According to the Defendant, his son, Francis P. Salemme, Jr., worked for DiSarro at this establishment. *Id*. His son wanted DiSarro to be his partner in opening a nightclub in Boston called the Channel. The Defendant further claimed that Frank Zamiello, a Rhode Island businessman and NELCN associate, provided funding for the purchase of the club. The defendant stated that Flemmi was also involved with the Channel Night Club. The Defendant claimed that Flemmi assisted in securing the necessary permits for the club through a Boston City official Flemmi with whom he was friendly.

The Defendant was questioned during this proffer about the May 1993 disappearance of Steven DiSarro. The Defendant told investigators that when he was a *capo* he met "Pascone" (Galea)[1] through "Bobby" Deluca. The Defendant told investigators that Pascone had told him that (Nicholas) Bianco[2] wanted DiSarro eliminated because he was concerned that DiSarro was going to be indicted. The Defendant further stated that he conveyed to Bianco that murdering DiSarro was "out of the question." He told investigators that DiSarro was a threat to Bianco because DiSarro had been paying Bianco $5000 per week from money he had acquired in

---

[1] Testimony at time of trial will establish that Pascone "Patty" Galea (1942-2015) was a soldier and one time capo in the NELCN.
[2] Testimony at time of trial will establish that Nicholas "Nicky" Bianco (1932-1994) was an NELCN soldier and one-time Boss.

3

business ventures with Harold Brown. The Defendant claimed that there was concern among the NELCN that DiSarro had testified before a local board in Rhode Island and implicated Bianco, (Kenneth) Guarino, and an unknown attorney in some type of fraud. *Id*. at ¶ 26.

After preliminary proffer interviews were completed, the Defendant decided to plead guilty and he and the Government entered into a December 7, 1999 plea agreement. In the agreement, the Defendant agreed to plead to all counts of the Fourth Superseding Indictment. The parties further agreed to certain guidelines calculations and a Sentencing Guideline range of 130-162 months. (*Plea Agreement dated December 12/8/1999* Criminal No. 94-10287-MLW). Contemporaneous with the entry of the plea agreement, the Government provided a letter to the Defendant entitled "Supplemental Submission Regarding Disposition in United States v. Francis P. Salemme." The Supplemental Submission confirmed the understanding of the parties relative to actions the Government intended to undertake after the Defendant's entry of his guilty pleas to the indictment. These intended actions included the issuance of a grand jury subpoena to the Defendant requiring his appearance before the grand jury to provide testimony related to alleged misconduct on the part of agents of the FBI. The Government also set forth its intention that if the Defendant should assert his Fifth Amendment privilege against self-incrimination at such appearance, the Government would seek an order compelling his testimony and to provide him with immunity. (*Supplemental Submission Regarding Disposition in United States v. Salemme* 12/7/1999).

On December 13, 1999, U.S. District Court Judge Nathaniel Gorton issued an order compelling the Defendant to testify and granting him immunity. (Attachment B). On December 14, 1999, the Defendant appeared before the grand jury and confirmed it was his intention to invoke his privilege against self-incrimination. He was apprised of Judge Gorton's order and

thereafter testified. That grand jury returned an indictment charging former FBI Special Agent John Connolly with a variety of offenses. (*U.S. v. John Connolly* 99-10428-JLT).

The *Connolly* matter was reached for trial and once again, the Defendant was called to testify under the grant of immunity. During the cross-examination of the Defendant counsel for John Connelly inquired into the disappearance of Steven DiSarro.

> Q. Your son was also associated with a person by the name of Stephen Desaro (sic) was he not?
> A. He was.
> Q. Mr. Desaro owned the Channel restaurant?
> A. Channel restaurant?
> Q. Channel bar?
> A. There was a music place called the Channel.
> Q. And it was a bar; was it not?
> A. I don't—I don't know if it was a bar. I don't think so. I think it was more of a rock club.
> Q But you don't think it served alcohol?
> A. It probably did, but it wasn't the classic bar as you say "bar."
> Q. All right.
> A. They had bands come in and out of there. It was big rock and roll place.
> Q. It was a club, in other words?
> A. Exactly.
> Q. And your son worked there for a while, did he not?
> A. He was down there all the time and worked there, yes.
> Q. And Mr. Desaro had information transactions with you as well did he not?
> A. With me personally?
> Q. Yes.
> A. No.
> Q. He didn't have any financial transactions?
> A. No.
> Q. You didn't have an interest in the Channel personally?
> A. No.
> Q. He didn't participate in putting video poker machines in other buildings with you?
> A. With me, no
> Q. Just with your son?
> A. Yes.
> Q. So is it your testimony that the only person that Mr. Desaro could be—could implicate was your son, not you personally?
> A. That's true.
> Q. And you knew the grand jury was getting closer to Mr. Desaro, did you not?
> A. How would I know that? I didn't know that.

Q. Mr. Desaro turns up missing during the grand jury investigation does he not?
A. I don't know.
Q. You didn't know if Mr. Desaro is missing; is that your testimony?
A. No. I don't know if he's missing when you said he was, during the grand jury investigation. I don't know.
Q. We, you know he's missing as of today; do you not?
A. As of today, yes.
Q. Prior to today, when is the last time you spoke to Mr. Desaro?
A. I have no idea.
Q. Back in 1992 or 1993; isn't that fair to say?
A. At least as far back, yes.
Q. And you knew in '92 and '93 was the middle of the investigation?
A. Yes.
Q. -relating to your son; isn't that right?
A. Yes.
Q. So he disappears in the middle of the investigation relating to your son; does he not?
A. That's reasonable.
Q. And is it reasonable to assume you had something to do with that disappearance, sir?
A. I-I don't know that.

Testimony of Francis P. Salemme, *United States of America v. John J. Connolly, Jr.* May 17, 2002, Tr. Page 170-173.

On or about January 24, 2003, the Defendant received a reduction of his sentence in *United States v. Francis P. Salemme* Criminal No. 94-10287-MLW. The reduction was based upon his "substantial assistance" in the prosecution of John Connolly.

Unfortunately for the Defendant, the government continued to investigate the disappearance of Steven DiSarro and on October 27, 2004, a grand jury returned a two-count Indictment that charged the Defendant, Francis P. Salemme, Sr. with Obstruction of Justice (18 U.S.C. §1503) and False Statements (18 U.S.C. § 1001). The Indictment alleged that the Defendant corruptly endeavored to obstruct the administration of justice by knowingly providing false information regarding the disappearance of Stephen DiSarro and did so to obtain a lower sentence than he would have received had he been truthful in the case. It further charged that he

knowingly made false statements about his knowledge regarding the disappearance of Stephen DiSarro and his involvement in the disappearance of Stephen DiSarro to government prosecutors and Drug Enforcement Agents employed by the United States. In these statements, the Defendant attempted to mislead prosecutors and investigators by providing false information suggesting others might be responsible for the disappearance. (*Indictment United States v. Francis P. Salemme, Sr.* Criminal No. 1:04 CR 10323-RGS).

On April 14, 2008, the Defendant entered into a plea agreement with the Government in which he agreed to plead guilty to both counts of the Indictment. Further, the Defendant agreed he would admit that on November 2, 1999, during a proffer session conducted pursuant to plea negotiations in *United States v. Salemme* Criminal No. 94-10287-MLW, he attempted to mislead federal prosecutors and investigators by providing false information suggesting that others (e.g. Nicholas "Nicky" Bianco) might be responsible for the disappearance and presumed murder of Stephen DiSarro. (*Plea Agreement,* Document 137 1:04-CR-10323-RGS pp 1-2 04/14/2008) (Attachment C). That same day, the Defendant appeared before the Court and entered guilty pleas to both counts. As a matter of routine, the Government tendered a factual basis in support of the charges contained in the Indictment and to which the Defendant intended to plead guilty. Importantly, the Defendant admitted that the information he provided investigators concerning Nicholas Bianco being involved in the disappearance of Steven DiSarro was false. (*Change of Plea Hearing United States v. Francis P. Salemme, Sr.* 1:04-CR-10323-RGS 04/14/2008 Tr. 23-27) (Attachment D).

On February 7, 2011, FBI Agents arrested NELCN soldier Enrico Ponzo. *United States v. Enrico Ponzo*, 853 F3d 558, 571 (1st Cir. 2017). The arrest occurred some seventeen years after Ponzo had fled the Boston area seeking to avoid a federal indictment. That indictment

7

charged him with a variety of RICO related offenses including Conspiracy to Commit Racketeering, (18 U.S.C 1962(d) and Conspiracy to Commit Murder in Aid of Racketeering (18 U.S.C. 1959(a)(5)). Part of the Indictment and subsequent trial related to the June 16, 1989 attempted assassination of the Defendant Salemme.

During the trial preparation process prosecutors contemplated calling the Defendant in its case against Ponzo. At the time, the Defendant was living under an assumed name and was enrolled in the Department of Justice's Witness Security Program. By contacting representatives of the Witness Security Program, prosecutors and FBI agents arranged for a meeting and interview with the Defendant Salemme. Over the course of two days, July 18-19, 2013 prosecutors and FBI agents interviewed the Defendant. (*FBI 302 of Special Agent Kristin D. Koch* dated 07/29/2013). Once again, the FBI asked the Defendant about the disappearance and presumed murder of Stephen DiSarro. On this occasion, the Defendant told agents that Stephen Flemmi and his son, William Hussey knew that Steve DiSarro was talking to the police and they probably killed him. The Defendant denied having anything to do with DiSarro's disappearance. *Id*. at pg. 14. Despite apparently now pointing the finger at Flemmi, the Defendant reiterated his claim that the late Nicky Bianco could have been responsible for DiSarro's disappearance. The Defendant told investigators "Nicky Bianco had a beef with DiSarro." "DiSarro was really a Rhode Island guy" and a (LCN) Captain, Piscone (sic) stated that Bianco said 'he would not be upset if DiSarro was not around'." *Id*.

**LEGAL ARGUMENT**

<u>2008 Plea Agreement and Plea Colloquy</u>

The Government now seeks to introduce the Defendant's April 14, 2008 written plea agreement, a portion of his change of plea hearing from that same day and his 2013 interview with FBI agents.

The Defendant's November 2, 1999 interview with investigators occurred pursuant to the terms of a duly executed proffer letter in which the Defendant specifically agreed that he could be prosecuted for any false statements he might make during proffer sessions. Generally, statements made by a defendant during the course of plea negotiations cannot be used against the defendant for any purpose. Rule 11 (f) Fed. R. Crim. Pro; Rule 410 Fed. R. Evid. Those protections however may be waived. *United States v. Mezzanatto,* 513 U.S. 196, 197, 210 (1995). The Supreme Court has held that "rather than deeming waiver presumptively unavailable absent some sort of express enabling clause, we instead have adhered to the opposite presumption." *Id.* at 200-201.

Assisted by most competent counsel, the Defendant endeavored to provide the Government with information he hoped would be helpful to them and which would someday assist him in securing a reduced sentence. To accomplish that aim, the Defendant knowingly and voluntarily waived the blanket protections of Rule 11(f) and Rule 410. In doing so, he entered into a contract with the Government. "Informal immunity agreements such as proffer agreements 'are shaped…by the language of the contract conferring the immunity.'" *United States v. Melvin*, 703 F. 3d 29, 36 (1st Cir. 2013) quoting *United States v. Hogan*, 862 F.2d 386, 388 (1st Cir. 1988). In determining the intent and meaning of the agreement, the Court is guided chiefly by contract law principles. *Id*.

In this instance, the Defendant agreed that "No statements made or other information provided by Mr. Salemme will be used directly against him, except… in a prosecution of Mr. Salemme based on false statements made or false information provided during the proffer." *Proffer letter* ¶2.  Consistent with the waiver contained in the agreement, the Defendant was prosecuted for making the false statement related to the disappearance of DiSarro.  The 1999 proffer letter did not protect the false statement.  The agreement specifically carved out an exception to the Rule 410 protections for false statements, providing that the Defendant could be prosecuted for making them.

On April 14, 2008, the Defendant executed a plea agreement with the Government.  At paragraph 1, the Defendant specifically agreed, "Defendant will admit that on November 2, 1999, during a proffer session conducted pursuant to plea negotiations in *United States v. Salemme, et al*., Crim. No 94-10287MLW, Defendant attempted to mislead federal prosecutors and investigators by providing false information suggesting that others (e.g. Nicholas "Nicky" Bianco) might be responsible for the disappearance and presumed murder of Stephen DiSarro."

On that same day, the Defendant entered guilty pleas to both counts of the Indictment. The Government provided a factual basis for the Indictment and the charges to which the Defendant was pleading.  At the conclusion of the Governments recitation of the facts, the Court stated:

> THE COURT: All right. Mr. Salemme, again, I think what is relevant here is the first section of the plea agreement, which is, I think, being indirectly alluded to by Mr. Kelly. Your agreement with the government -- you acknowledge that, according to the plea agreement, that you gave false information deflecting the government away from whoever was responsible for the DeSoreau (sic) murder. Again, as the plea agreement very carefully stipulates, you're not accepting or admitting any responsibility for or knowledge of that murder, but you are acknowledging that, in fact, you gave false information about who might be involved, including false information about Mr. Bianca (sic). Is that true?
> A.THE DEFENDANT: That's what I'm pleading to, your Honor, you're correct.

Q. THE COURT: Are you pleading guilty willingly, freely and voluntarily?
A. THE DEFENDANT: Yes, your Honor, I am.
Q. THE COURT: Has anyone coerced you in a physical sense into pleading guilty?
A. THE DEFENDANT: No, they haven't.
Q. THE COURT: Have any promises other than those that are set out in the plea agreement or has otherwise been discussed --
A. THE DEFENDANT: None, your Honor.
Q. THE COURT: -- been made?
Q. THE COURT: Have any threats been made other than, obviously, the threat of being prosecuted?
A. THE DEFENDANT: No, your Honor.
Q. THE COURT: Have you had sufficient time to discuss with your attorneys the charges in the case, your rights, the possible consequences of pleading guilty?
A. THE DEFENDANT: Yes, I have, your Honor.
Q. THE COURT: Do you believe that they have acted at all times in your best interest?
A. THE DEFENDANT: What?
Q. THE COURT: Do you believe that they at all times have acted in your best interest?
A. THE DEFENDANT: Absolutely, yes, your Honor.
Q. THE COURT: Are you or any other counsel aware of any reason I should not accept the plea?
A. MR. BOOZANG: We do not, your Honor.

The false statement the Defendant made concerning Bianco's possible complicity in the disappearance of DiSarro is a false declaration, relevant to show his guilty state of mind. Here, the Defendant has pointed the investigators in a direction other than towards him and has admitted that the statement was false. This evidence is probative of the Defendant's own guilt. *United States v. Kaplan*, 832 F.2d 676 (1st Cir. 1988), *United States v. Zang*, 703 F. 2d 1186 (10th Cir. 1982). Deflecting investigators away from himself and onto another suspect is probative circumstantial evidence of his own involvement in the offense. That probative value of the evidence far outweighs any undue prejudice. FED. R. EVID. 401 and 403. His admissions in open court and in a written plea agreement are well outside the terms of the much earlier proffer agreement or the limited immunity granted to him by the court to compel him to testify at both

the *Connolly* grand jury and trial.  Because the prosecution of Salemme for false statements was allowed by the terms of the proffer agreement, statements made in open court and in publicly filed court documents, those statements should be admissible evidence against him.[3]

The guilty plea to the false statement before another court is admissible as a party admission.  *See United States v. Ortiz-Graulau, 526 F.3d 16, 21 (1st Cir. 2017)(G*uilty plea to possession of child pornography relevant to defendant's knowledge of contents of photographs in his prosecution for exploiting a minor), *United States v. Soto-Beniquez, 356 F.3d 1, 34 (1st Cir. 2003)(G*uilty pleas and plea agreements linked defendants to charged conspiracy); *United States v. Haddad*, 10 F.3d 1252, 1258 (7th Cir. 1993) (Guilty plea in state court to gun charge admissible in federal prosecution for firearms violation).  Accordingly, both the plea agreement and those portions of the transcripts touching on the Defendant's admissions to making the false statements should be admitted.

The July 2013 Interview

By July of 2013, the Defendant Salemme had completed his prison sentence for his 2008 conviction and had once again been enrolled in the Witness Security Program.  He was living under a new identity and had been relocated outside of the Massachusetts area.  Contact with the Defendant was arranged through the Department of Justice Office of Enforcement Operations (OEO).  Through OEO the Government arranged to meet with the Defendant and discuss the possibility of his testifying at Ponzo's upcoming trial an aspect of which involved the Defendant having been shot in June of 1989.  The Defendant agreed to meet with prosecutors and investigators.

---

[3] Unlike the statement before the court in *United States v. Littlefield*, 840 F. 2d 143, (1st Cir. 1988), there is no need in this case for the jury to first find the Defendant guilty of the crime charged before they can consider the statement for purposes of showing a consciousness of guilt. *Id*. at 149.

On July 18, 2013, two FBI Special Agents and two Assistant United States Attorneys met with the Defendant in a hotel room. The Government had arranged for the Defendant to travel to the location paying for both the Defendant's travel and lodging.  At no time were any promises made to the Defendant.  There was no discussion of the 1999 proffer letter or immunity Order or their application to the interview.

The interview covered a variety of topics ranging from the Defendant's entry into the NELCN, the 1989 assassination attempt on him and his ascension to the position of boss. Toward the end of the interview, the Defendant discussed his former associate Steven Flemmi. The Defendant spoke disparagingly of Flemmi and claimed "Flemmi and his son, William Hussey knew that DiSarro was talking to the police and they probably killed him."  (*FBI 302 of Special Agent Kristen Koch dated 07/18/2013 pg. 14*)

The Government now seeks to introduce this statement into evidence for the same reasons it seeks to introduce the 2008 plea agreement and plea colloquy.  The Defendant seeks to blame someone else for the murder of DiSarro and that someone happens to be an individual that he knows to be a former FBI informant who previously cooperated against him and who is slated to testify against him in this case.  The statement was not made pursuant to a proffer agreement nor were there any promises of immunity, formal or informal, made to him.  The Defendant engaged in the interview freely and voluntarily.  Attributing the murder of DiSarro to Flemmi, particularly when contrasted with the Defendant's earlier attempt to cast blame at Bianco is powerful evidence of his own culpability.  Accordingly, the 2013 statement should be admitted.

## **CONCLUSION**

Neither the plea agreement, the plea colloquy nor the 2013 interview are protected by the much earlier proffer letter or immunity Order. The proposed evidence is highly probative of a consciousness of guilt and far outweighs any prejudice. The Government therefor requests a pretrial ruling allowing the Government to introduce the evidence in its case-in-chief.

                                              UNITED STATES OF AMERICA

                                              ANDREW E. LELLING
                                              UNITED STATES ATTORNEY

By:    /s/ Fred Wyshack
          Assistant United States Attorney
          /s/William J. Ferland
          Special Assistant United States Attorney
          Office of the United States Attorney

## **Certification**

I, William J. Ferland, hereby certify that I served a copy of the Government's Memorandum of Law in Support of Its Motion for Partial Closure of the Courtroom on counsel of record by filing same through the court's ECF system this 26th day of March, 2018.

/s/ William J. Ferland
Special Assistant United States Attorney