UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Crim. No. 16-10258-ADB |
| v. ) | |
| ) | |
| FRANCIS P. SALEMME and ) | |
| PAUL M. WEADICK, ) | |
| ) | |
| Defendants. ) | |

GOVERNMENT'S TRIAL BRIEF

The United States submits this brief pursuant to the Court's scheduling Order dated January 11, 2018.  The defendants are charged with the 1993 murder of a federal witness, Steven DiSarro, in violation of 18 USC 1512(a)(1)(C).

I.     **Summary Of The Case.**

The evidence at trial will prove that Steven DiSarro, a native of Providence, R.I., was a well known real estate developer and night club operator.  He was also associated with a number of individuals who were members or associates of the New England La Cosa Nostra (NELCN) located in Providence.  In approximately 1989, NELCN associate Thomas Hillary introduced DiSarro to Salemme and Salemme's son Frank, Jr.  At that time, Salemme had recently been released from prison and was a captain or "capo" in the NELCN.  Hillary had been assigned to Salemme's "crew" by then NELCN boss Raymond J. Patriarca, AKA "Junior."  Among other criminal activities, Salemme was identifying and extorting bookmakers and loansharks in the Framingham/Worcester/Milford area, and planned to place illegal "video poker" machines in bars and restaurants in that area.  DiSarro had a source for the video poker machines and agreed

1

to assist Hillary, Salemme, and Salemme. Jr. in acquiring the machines and placing them in local establishments.

By 1990, Salemme had emerged as the boss of the NELCN. DiSarro had developed a close relationship with Salemme, Jr. and Paul Weadick, a close friend of Salemme, Jr. At the time, DiSarro was also pursuing the purchase of a South Boston music venue called "The Channel." In approximately September 1990, DiSarro had reached an arrangement with the owners of The Channel to take control of the business subject to completing the purchase and sale. The plan was that Salemme would enjoy an undisclosed interest in The Channel and assist DiSarro in obtaining financing for the purchase. Hillary assisted DiSarro in the initial planning stages, but had a "falling out" with Salemme who instructed Hillary to leave Boston or Salemme would kill Hillary.

Shortly thereafter, DiSarro, Salemme, Jr. and Paul Weadick became ensconced in The Channel. Other members of organized crime also began to frequent the South Boston location. This group intimidated the owners, Peter Booras, Harry Booras and John Burke, who were trying to sell the business through a bankruptcy proceeding. Eventually, in October 1992, DiSarro and Salemme acquired The Channel doing business as James Madison Corp. The nominal principal of James Madison Corp. was Roland Wheeler, DiSarro's half-brother.

In June 1992, Salemme, Jr., Hillary and others were indicted in a labor racketeering case involving the Teamsters' Local 25. Salemme and Salemme, Jr.'s relationship to The Channel became the subject of a grand jury investigation in 1993, and became a subject of great publicity due to public proceedings which occurred in connection with Salemme, Jr.'s indictment.

DiSarro was also the subject of investigation during this period not only for his involvement in The Channel, but also for his participation in several bank frauds connected to his

real estate business.  Numerous events connected to these investigations caused great distress to DiSarro.  On March 16, 1993, DiSarro was confronted by an FBI agent who advised DiSarro that he would soon be indicted, and that DiSarro should cooperate with the FBI in their investigation of the Salemmes.

Prior to DiSarro's murder on or about May 10, 1993, Salemme confided in his longtime criminal associate, Stephen Flemmi, that Salemme was worried that DiSarro would not "stand up" and would cooperate with the authorities.  Similarly, Salemme expressed his concerns about DiSarro to Robert DeLuca, an NELCN captain.

On or about the Friday before May 10, 1993, DiSarro was extremely distraught and told his half brother Wheeler that DiSarro had to meet with Salemme.  During this same period, Weadick was making extremely disparaging remarks about DiSarro to Weadick's then girlfriend, and was complaining that DiSarro was avoiding a meeting with them.

Shortly before May 10, 1993, Salemme called DeLuca and told DeLuca to prepare to receive "a package."  DeLuca understood a package to mean a body.

On May 10, 1993, DiSarro left his home and was picked up by a man in a red "jeep."[1] He left a note for his son that indicated he (DiSarro) would not be able to see his son for an unspecified period of time.  DiSarro was never seen again by any member of his family.

Later that day, Flemmi went to 14 Marie Avenue in Sharon to meet with Salemme.  As Flemmi walked in the back door he observed Salemme, Jr. strangling DiSarro while Weadick

---

[1] Becky Geiger will testify that she owned a red Isuzu that was frequently used by Salemme, Jr. and Weadick. The Government will introduce surveillance photographs of the vehicle along with Pennsylvania registration information documenting Geiger's ownership of the vehicle. On May 10, 1993, Salemme, Jr. was on house arrest with electronic monitoring so it is unlikely that he operated the vehicle that day. Geiger, Salemme, Jr.'s girlfriend at the time, did not pick DiSarro up. Thus, the logical conclusion is that Weadick picked DiSarro up and drove him to the Sharon house.

held DiSarro's legs off the ground. Salemme and his brother John Salemme were also present observing the murder.

Salemme subsequently transported DiSarro's remains to Providence, R.I. where he transferred the body to Robert DeLuca's brother, Joseph. Per Salemme's instructions to prepare to receive a package, Robert DeLuca had arranged with the owner of an old mill/warehouse in Providence to dispose of the body in a pit the owner had dug in the rear of the building. After Joseph DeLuca received DiSarro's remains from Salemme, Joseph and two others waited until dark and threw DiSarro's remains in the pit. The pit was subsequently filled by the owner the following day. After the murder, Salemme discussed the murder in detail with both Flemmi and DeLuca.

On March 22, 2016, the FBI received information from the owner of the Providence mill that a body was buried in the rear yard. The FBI Evidence Recovery Team in conjunction with the Rhode Island Medical Examiner recovered DiSarro's remains on March 30-31, 2016.

II. **The Evidence**

    A.    <u>The conspiracy</u>

The conduct alleged in the Indictment was the product of both defendants' participation in the activities of the NELCN. The infiltration of legitimate businesses by members of organized crime is a traditional method of generating income for the organization and its members. There are many advantages to such an arrangement including no work/no show employment, cash skims, and money laundering, as well as creating the appearance of legitimate sources of income for members of the criminal enterprise. This was especially true of The Channel's business model where cash was collected at the door, at the bar, and for parking.

In the case at bar, neither Salemme nor Salemme, Jr.'s name appeared on any of the ownership paperwork although they, along with Disarro, were the real parties in interest. Essentially, the evidence will establish that DiSarro and his half-brother, Roland Wheeler, "fronted" for the Salemmes.

Testimony primarily from Hillary, Flemmi and DeLuca, but also from others, will prove the existence of the NELCN, the participation of Salemme and Weadick in the activities of the enterprise, and the scheme to infiltrate The Channel.

B. Recorded conversations

The government plans to use two recorded conversations at the trial of this matter. The first was a consensual recording made on September 26, 1990 between Salemme, Jr. and a cooperating witness, Roberto Franchi. In that conversation, Salemme, Jr. boasts about buying The Channel. Salemme, Jr. also relates to Franchi that Salemme had banished Hillary from Boston.[2]

The second recorded conversation is a Title III intercept made on December 11, 1991. Salemme met with a Gambino LCN captain Natalie Richichi. Among the matters discussed were Salemme's control of the NELCN and a discussion about DiSarro on an unrelated matter.

C. Physical surveillance

Numerous law enforcement witnesses will testify about observations made during the course of several investigations targeting members and associates of the NELCN during the period 1988-1993. Particularly, this testimony will focus on the presence of Salemme and

---

[2] The recording of this conversation no longer exists, however, the transcript does exist. The FBI agent who was assigned to the investigation will be able to testify regarding the accuracy of the transcript and his recollection of the recorded conversation.

Salemme, Jr. with DeLuca, Flemmi and Weadick.  On occasion, photographs were taken of these meetings, and those photographs will be offered as evidence.

    D.    <u>Chronology of the federal investigation</u>

Documents and testimony will be offered to demonstrate the theory of the prosecution, i.e., that the defendants murdered DiSarro because they were concerned that he might cooperate with the ongoing investigations of the Salemmes.

1) In 1988, Salemme was released from prison and shortly thereafter became the subject of law enforcement scrutiny.

2) On or about June 19, 1992 an arrest warrant issued for Francis P. Salemme, Jr. in 1:92-cr-10179.  He was arrested shortly thereafter.

3) On July 14, 1992, Francis P. Salemme, Jr. was arraigned on that indictment and bail was set.  Certain conditions of release were imposed on Francis P. Salemme, Jr. Those conditions included: the defendant was required to live only at 14 Marie Avenue, Sharon, Massachusetts; his travel was restricted to Massachusetts; the defendant was required to report to pretrial services by phone every Monday and Friday and in person every Wednesday; the defendant was placed on a curfew requiring him to be in his residence from 7:00 pm to 7:00 am.

4) In August 28, 1992, forty-five search warrants were executed in connection with an ongoing federal/state investigation of illegal gambling and loansharking in the Greater Boston area.  A number of the subjects of these search warrants were making extortion payments colloquially known as "rent" to Salemme and/or his associates.

5) On December 7, 1992, Steven DiSarro executed an affidavit in support of the modification of the conditions of release of Francis P. Salemme, claiming that Francis P.

Salemme, Jr. was employed at The Channel as an assistant manager required to work beyond the 7:00 pm curfew imposed by the Court

6) On December 14, 1992, the conditions of release for Francis P. Salemme, Jr. were modified extending the curfew on Thursday, Friday and Saturday requiring him to be home by 2:00 am. Curfew was lifted only for purposes of employment at The Channel.

7) In or about January 1993, a federal grand jury issued a subpoena requesting records for The Channel.

8) On January 12, 1993, the *Boston Herald* reported that Thomas Hillary was cooperating with federal authorities. Hillary had introduced DiSarro to the Salemmes.

9) On February 5, 1993, Salemme, Jr. was arrested for assaulting a musician at The Channel.

10) On February 18, 1993, the *Boston Herald* reported that Salemme, Jr.'s employment at The Channel had been terminated.

11) On February 24, 1993, the original conditions of release were reinstated as Francis P. Salemme was no longer employed at The Channel.

12) On March 16, 1993, FBI SA Robert Walther met with DiSarro at Jacques Bar located at 87 Broadway in South Boston. SA Walther advised DiSarro that DiSarro would soon be indicted for bank fraud and suggested that Disarro should cooperate with the FBI's investigation of the Salemmes.

13) On March 17, 1993, Salemme, Jr. was arrested for violating his conditions of release in connection with the February 5, 1993 incident at The Channel.

14) On March 18, 1993, the government filed a motion to revoke Salemme, Jr.s conditions of release.  The Court ordered that a hearing be held and further ordered Francis P. Salemme, Jr. to be subject to electronic monitored pending further Order of the Court.

15) On March 23, 1993, an evidentiary hearing concerning the alleged violation of the terms and conditions of release commenced.  The substance of the hearing was reported in the *Boston Herald*.

16) On March 24, 1993, the court placed Francis P. Salemme, Jr. under house arrest subject to electronic monitoring and allowed him to leave the house only for court appearances.

17) On April 1, 1993, Roland Wheeler appeared before the federal grand jury investigating, among other things, the Salemmes' relationship with The Channel.

18) On April 23, 1993, the *Boston Herald* reported that prominent bookmaker, Burton "Chico" Krantz was cooperating with federal authorities.  Krantz was paying rent to Salemme.

19) On or about May 10, 1993, DiSarro left his home in Westwood and was brought to 14 Marie Avenue in Sharon where Salemme, Jr. was under house arrest.  Paul Weadick was present with Salemme, Salemme, Jr, and John "Jackie" Salemme.  Salemme, Jr, strangled DiSarro while Paul Weadick held DiSarro's legs off the floor.

E. The Channel witnesses

Harry Booras and John Burke will testify that they, along with Peter Booras, owned The Channel.  They will also testify about the sale of The Channel to DiSarro and Wheeler.  They will testify that in the Fall of 1990 they entered into an arrangement with DiSarro where DiSarro could manage the business while he arranged financing for an eventual purchase.  At the time, The Channel was in bankruptcy.  When DiSarro appeared at The Channel he was accompanied

by Salemme, Jr. and Weadick.  Booras and Burke quickly realized that they were losing control of the business, and that the Salemmes were the real parties in interest.  There were several violent confrontations between Salemme, Jr. and the Booras brothers as well as other Channel employees.  Eventually, DiSarro and Wheeler bought the business at a bankruptcy auction.

Weadick's then girlfriend was employed at The Channel.  She will testify about Weadick's role at The Channel as well as Weadick's close relationship with Salemme, Jr.  She will also testify about Salemme, Jr. and Weadick's growing disenchantment with DiSarro and concerns that "he talked too much."

Salemme, Jr.'s then girlfriend, Becky Geiger, will also testify about Salemme, Jr's altercation at The Channel with a band member on or about February 4, 1993 that resulted in Salemme, Jr.'s arrest.  Geiger testified at the hearing in federal court that resulted in Salemme, Jr. being placed under house arrest on an electronic bracelet.

     F.     The Murder

As described above, DiSarro was the subject of investigation during this period not only for his involvement in The Channel, but also for his participation in several bank frauds connected to his real estate business.   The Salemmes were also the subjects of increasing law enforcement pressure during 1992 and 1993 including the indictment of Salemme, Jr., and the cooperation of several key individuals such as Thomas Hillary and Chico Krantz.

The Salemmes' connection to The Channel was under increasing law enforcement scrutiny primarily due to events connected to the ongoing prosecution of Salemme, Jr. and issues related to his ever changing conditions of release.  These events were publicized in the local media.  Roland Wheeler will testify that the incident at The Channel that resulted in Salemme. Jr.'s arrest and subsequent termination of employment caused great distress to himself as well as

9

DiSarro.  On April 1, 1993, Wheeler will testify that he appeared at a federal grand jury and was questioned extensively about the Salemmes' connection to The Channel and the true parties in interest.  He will testify that his grand jury appearance was not a secret among employees at The Channel.

Stephen Flemmi will testify about his knowledge of Salemme's connection to The Channel.  During the period subsequent to Salemme's release from prison, Salemme and Flemmi were close associates and were involved together in criminal ventures.  Prior to DiSarro's murder, Salemme confided in Flemmi that Salemme was worried that DiSarro would not "stand up" and would cooperate with the authorities.  Salemme was concerned that DiSarro's cooperation would hurt Salemme, Jr.

Similarly, Robert DeLuca will testify that Salemme expressed concerns that DiSarro was stealing from them.  According to Deluca, he told Salemme he should "get rid of him" meaning he should fire DiSarro.  Deluca is expected to testify that Salemme replied "well Frankie Boy will take care of that." Some time later Salemme contacted Deluca by pager.  Deluca returned the call from a payphone and learned from Salemme that he had "a package" for him and that he would be delivering it to Deluca in Rhode Island.  Salemme told Deluca to make sure he had a car and "get a hole dug."

Deluca will testify that he knew the term "package" to mean that Salemme had a body that required disposal.  DeLuca and his brother Joseph immediately began to look for a potential location to bury a body.  They met with an associate, William Ricci, who owned an old mill in Providence that Ricci was developing.  Ricci had excavating equipment in the rear and had already dug a deep pit in which Ricci planned to dump construction debris.  They asked Ricci if they could dump a body in the pit.  Ricci agreed. Deluca will testify that his brother Joseph

volunteered to meet with Salemme and dispose of the body.  Joseph Deluca will testify that he was concerned that his brother had small children and might be caught.  Robert Deluca recalls that he had at least twenty-four hours advance notice concerning the receipt of the "package."  Joseph Deluca will testify that he met with Salemme at a White Cross Pharmacy in North Providence, Rhode Island.  He directed Salemme to a nearby jewelry manufacturing plant located in a residential neighborhood near the Providence/North Providence city line.  Salemme followed Joseph Deluca in a sport utility vehicle.  When they arrived at the jewelry plant they went to a car that had been left for them in the parking lot.  The two men then transferred the body to the trunk of the parked car.  Joseph Deluca will testify that the body was wrapped in a blue plastic tarpaulin.  Later that day, Joe DeLuca and two others retrieved the vehicle and drove to Ricci's mill.  They waited inside with the body until it was dark and the lights went out in the nearby buildings.  They then threw DiSarro's remains in the pit as previously planned.  The pit was subsequently filled by Ricci the following day.

In the days following the burial, Deluca met with Salemme at which time Salemme told him that the body was DiSarro.  Salemme explained, "Frankie Boy strangled him."  Salemme told Deluca that he was present as was his brother Jackie.  Salemme explained the reason for the murder to Deluca.  He said that he found out that DiSarro was robbing money and Flemmi told him that DiSarro was giving information to Wyshak (Assistant United States Attorney Fred Wyshak).

Deluca is further expected to testify that approximately three weeks after the murder Salemme told him that the police had questioned "that kid Paul."  Salemme told DeLuca that it was Paul Weadick who "took DiSarro to Frankie Boy's house."

11

DiSarro's half brother, Roland Wheeler, will testify that shortly before May 10, 1993, DiSarro was extremely distraught and told Wheeler that DiSarro had to meet with Salemme. DiSarro had also confided in Wheeler that he had been approached by an FBI agent and had been told that he (DiSarro) would be indicted.

Weadick's then girlfriend will testify that shortly before DiSarro's disappearance, Weadick was making extremely disparaging remarks about DiSarro, and was complaining that DiSarro was avoiding a meeting with them. Weadick told her that they were trying to lure DiSarro to Salemme's Sharon home because DiSarro would believe he was safe there due to all the law enforcement surveillance.

Pamela DiSarro will testify that on or about May 10, 1993, DiSarro left his home and was picked up by a man in a red "jeep." She subsequently found a note left by DiSarro in his son's bedroom that indicated he (DiSarro) would not be able to see his son for an unspecified period of time. DiSarro was never seen again by any member of his family.

Flemmi will testify that on or about May 10, 1993 he went to 14 Marie Avenue in Sharon to find Salemme. This was not a planned meeting and Flemmi will testify that, at the time, Salemme was living in Stoughton with Salemme's then girlfriend, Donna Wolf. As Flemmi approached the house, he saw DiSarro and Salemme, Jr. walking to the back of the house. Flemmi also walked around to the back of the house and entered the house through a rear vestibule off the kitchen. As Flemmi walked in the back door, he observed Salemme, Jr. strangling DiSarro while Weadick held DiSarro's legs off the ground. Salemme and his brother John Salemme were also present observing the murder. Flemmi told Salemme he would talk to him later and left the house.

G. The Recovery of DiSarro's remains

Based upon information provided by William Ricci to the FBI, the FBI's Evidence Recovery Team (ERT) in conjunction with the Rhode Island's Medical Examiner's Office commenced excavation of the land behind Ricci's mill on March 29, 2016. The following day, DiSarro's remains were recovered. There will be extensive testimony and forensic evidence offered by a member of the ERT including photos, clothing, and a rope.

DiSarro's identity was verified through DNA analysis. An FBI agent will testify that he obtained DNA samples from members of DiSarro's family. A DNA expert will testify that the DNA obtained from the remains recovered behind Ricci's mill matched the DNA samples obtained from DiSarro's family members.

The Medical Examiner will testify that the cause of death was homicide due to strangulation.

H. Evidence of Salemme's flight

At least two United States Marshals assigned to the federal Witness Security Program (WITSEC) will testify that at the time DiSarro's remains were discovered in Providence, R.I., Salemme was a relocated witness and a participant in the WITSEC program. The Marshals will also testify that Salemme left his home in July 2016 without notification to the marshals in violation of program rules. He was subsequently tracked to Milford, Connecticut where he was arrested. At the time of his arrest he had $28,098 in cash, and his vehicle contained clothes and other personal items. Subsequent investigation revealed that Salemme had vacated his apartment, emptied his bank account, and moved into a hotel before he left on his trip to New England.

I.    <u>Other evidence</u>

Weadick's then girlfriend will testify that after DiSarro's murder, Weadick drove her to a location in Rhode Island or on Cape Cod and suggested that DiSarro was buried at that location. Because she was not a native of New England and had only lived in the Boston area for a short time, Weadick's girlfriend was not sure of the location. She will further testify that Weadick frequently made statements to her that Disarro was gone and would not be seen again. Weadick also remarked to her on other occasions about good locations to bury a body.

Documentary evidence will be offered regarding Salemme's ever changing stories about DiSarro's disappearance. In fact, his plea of guilty to his indictment for making false statements to the FBI about DiSarro's disappearance will be offered as well as subsequent false statements made to the FBI about DiSarro.

The evidence described in this brief does not constitute all the evidence nor all the details of all the evidence that the government will seek to admit at the trial of this matter.

**III.**    **Statement Of The Law**

<u>Tampering with a witness -- 18 U.S.C. § 1512(a)(1)</u>

Section 1512(a) provides in pertinent part:

> **(a) (1)** Whoever kills or attempts to kill another person, with intent to—
>
> …..
>
> **(C)** prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;
>
> shall be punished as provided in paragraph (3).
>
> …..
>
> **(3)** The punishment for an offense under this subsection is —

> **(A)** in the case of a killing, the punishment provided in sections 1111 and 1112;

Section 1111(b) states in pertinent part,

> "Whoever is guilty of murder in the first degree shall be punished by death …"

Because the indictment charges a violation of 18 U.S.C. § 1512(a)(1) for the first degree murder of DiSarro, it is not time-barred. While non-capital federal crimes are subject to a five-year statute of limitations (unless some other statute specifies otherwise), *see* 18 U.S.C. § 3282, capital crimes are not subject to any statute of limitations, *see* 18 U.S.C. § 3281. Whether a crime is considered "capital" or "punishable by death" for the purposes of 18 U.S.C. §§ 3281 and 3282 "depends on whether the death penalty may be imposed for the crime under the enabling statute, *not* 'on whether the death penalty is in fact available for defendants in a particular case.'" *United States v. Ealy,* 363 F.3d 292, 296-97 (4th Cir. 2004) (citing *United States v. Church,* 151 F.Supp.2d 715, 717, 722 (W.DVa. 2001). With regards to 18 U.S.C. § 1512(a)(1), the penalty is proscribed under 18 U.S.C. § 1111 and 1112. *See* 18 U.S.C. § 1512(a)(2). 18 U.S.C. § 1111 has always permitted the death penalty for convictions of first-degree murder. As such, charges of murder with the elements of murder in the first-degree under 18 U.S.C. § 1512(a)(1) fall under the ambit of 18 U.S.C. § 3281 and are not subject to any statute of limitations. *See e.g. United States v. Emery*, 186 F.3d 921, 924 (8th Cir. 1999); *Ealy,* 363 F.3d at 297 (holding that murder under 18 U.S.C. § 1512(a)(1)(C) is not time-barred).

The United States must prove the following elements to sustain a charge under 18 U.S.C. § 1512(a)(1)(C):

(1) a killing or attempted killings,

(2) committed with a particular intent, namely, an intent

      a. to "prevent" a "communication"

      b. about "the commission or possible commission of a Federal offense"

      c. to a federal "law enforcement officer or judge"

*Fowler v. U.S.*, 563 U.S. 668, 672 (2011); *U.S. v. Jimenez Benevi*, 788 F.3d 7, 24 (1st Cir. 2015).

If the United States proves that the defendant committed the murder to prevent the victim from communicating with a particular individual or set of individuals (who were in fact federal law enforcement officer(s)), the United States need not prove that the defendant knew of the federal connection. *See Fowler*, 563 U.S. at 672. *See also* 18 U.S.C. § 1512(g) (stating that "[i]n a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance ... that the law enforcement officer is an officer or employee of the Federal Government"). Furthermore, the United States does not need to prove that the defendant had a particular federal law enforcement officer in mind. *Fowler,* 563 U.S. at 677. In such a case where the defendant did not have a particular federal law enforcement officer in mind, the United States must show that there was a "reasonable likelihood"[3] that had the victim communicated with law enforcement officers "at least one relevant communication would have been made to a federal law enforcement officer." *Id*.

Pre-*Fowler* jurisprudence held that the United States did not have to prove that the defendant know that the victim was, or was planning to be, a witness or informant. In *U.S. v. Rand,* 482 F.3d 943, 946-48 (7th Cir. 2007), the Seventh Circuit stated that the United States does not need to prove that the person who was killed was actually a crime victim, witness, or

---

[3]     The Supreme Court explained that such a likelihood need not go "beyond a reasonable doubt" or "even that it is more likely than not," but that the likelihood of communication to a federal officer must be more than "remote, outlandish, or simply hypothetical." *Fowler v. U.S.*, 563 U.S. 668, 678 (2011).

informant, but that it was enough that the person was killed to serve as a decoy in order to prevent a Pretrial Services officer from communicating to the court that the defendant had violated his release agreement. The First Circuit, before *Fowler,* outlined a four-part test,[4] that included a requirement that the United States prove that the defendant believed the victim might communicate with federal officials. *See United States v. Rodriguez-Marrero,* 390 F.3d 1, 13 (1st Cir. 2004), citing *United States v. Stansfield,* 101 F.3d 909, 918 (3d Cir. 1996). However, since then, the test in *Rodriguez-Marrero* has been replaced by the *Fowler* test. *See Jimenez Benevi*, 788 F.3d at 24.

Although there are no First Circuit Pattern Jury Instructions for a violation of 18 USC § 1111, instructions from the Fifth Circuit are helpful.

> Title 18, United States Code, Section 1111, makes it a crime for anyone to murder another human being with premeditation. For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> *First*: That the defendant unlawfully killed;
>
> *Second*: That the defendant killed with malice aforethought;
>
> *Third*: That the killing was premeditated; and
>
> *Fourth*: That the killing took place within the territorial jurisdiction of the United States.
>
> To kill "with malice aforethought" means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life.

---

[4] The four-part test is: "(1) the defendant killed or attempted to kill a person; (2) the defendant was motivated by a desire to prevent the communication between any person and law enforcement authorities concerning the commission or possible commission of an offense; (3) that offense was actually a federal offense; and (4) the defendant believed that the person in (2) above might communicate with the federal authorities." *See United States v. Rodriguez-Marrero,* 390 F.3d 1, 13 (1st Cir. 2004), citing *United States v. Stansfield,* 101 F.3d 909, 918 (3d Cir. 1996).

To find malice aforethought, you need not be convinced that the defendant hated the person killed, or felt ill will toward the victim at the time.

In determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument and the manner in which death was caused.

A killing is "premeditated" when it is the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of that intent.

          Respectfully submitted,

          ANDREW E. LELLING
          United States Attorney

By:    /s/ Fred M. Wyshak, Jr.
       Fred M. Wyshak, Jr.
       William J. Ferland
       Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I, Fred M. Wyshak, Jr., hereby certify that on March 28, 2018, I served a copy of this document on counsel of record for the defendants by electronic filing.

          */s/ Fred M. Wyshak, Jr.*
          Fred M. Wyshak, Jr.
          Assistant U.S. Attorney