UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_______________________________

UNITED STATES OF AMERICA,

Plaintiff,

v.

FRANCIS P. SALEMME, and
PAUL M. WEADICK,

Defendants.

_______________________________

Criminal Action
No. 16-10258-ADB

June 1, 2018

Pages 431 to 506

TRANSCRIPT OF TRIAL TESTIMONY OF
ROBERT P. DELUCA, JR.
BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT COURT
JOHN J. MOAKLEY U.S. COURTHOUSE
ONE COURTHOUSE WAY
BOSTON, MASSACHUSETTS 02210

JOAN M. DALY, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 5507
Boston, Massachusetts 02210
joanmdaly62@gmail.com

APPEARANCES:

FOR THE GOVERNMENT:

FRED M. WYSHAK, JR.
Assistant U.S. Attorney
United States Attorney's Office
John J. Moakley Courthouse
Suite 9200
One Courthouse Way
Boston, Massachusetts 02210
617.748.3144
fred.wyshak@usdoj.gov

WILLIAM J. FERLAND
Assistant U.S. Attorney
United States Attorney's Office
50 Kennedy Plaza
8th Floor
Providence, Rhode Island 02903
401.709.5000
william.ferland@usdoj.gov

FOR THE DEFENDANT FRANCIS P. SALEMME:

ELLIOT M. WEINSTEIN
83 Atlantic Avenue
Boston, Massachusetts 02110
617.367.9334
elliot@eweinsteinlaw.com

STEVEN C. BOOZANG
450 Washington Street
Dedham, Massachusetts 02026
781.251.9991
sboozang@boozanglaw.com

(Appearances continued on next page.)

APPEARANCES (continued):

FOR THE DEFENDANT PAUL M. WEADICK:

WILLIAM D. CROWE
Crowe & Dunn
141 Tremont Street
8th Floor
Boston, Massachusetts 02108
617.367.6767
wcrowe@crowedunn.com

MARK W. SHEA
Shea & LaRocque
929 Massachusetts Avenue
Suite 200
Cambridge, Massachusetts 02139
617.577.8722
markwshea@gmail.com

P R O C E E D I N G S

THE COURT: So I am going to allow the testimony in. I don't think it's unduly prejudicial or unduly cumulative, but I want to understand how it's going to come in. I'm fine for it coming in for the fact that the two of them were in a car together and there's evidence that there was going to be a drug rip off.

MR. CROWE: Can we go to side bar, Judge, because there's one sensitive issue.

THE COURT: Okay. Come to side bar.

(Bench conference held.)

THE COURT: This is still on the motion or changing topics?

MR. CROWE: Same motion.

THE COURT: Okay.

MR. CROWE: I understand that the government intends to put Bruce Mathews on the stand and so forth. Having reviewed the police report in some detail, there's a part of the report that indicates that Paul was armed.

MR. FERLAND: With a knife.

MR. CROWE: As I understand it the knife was not on Paul. The knife was in the vehicle.

MR. FERLAND: Correct.

MR. CROWE: He was not charged with being armed.

MR. FERLAND: Correct.

MR. CROWE: And he pled out to a $50 fine. I just thought that part of the report that suggests that Paul was armed was a little deceptive.

MR. FERLAND: There was a weapon.

THE COURT: Whose car was it?

MR. CROWE: It's not his car.

THE COURT: What kind of knife?

MR. FERLAND: It's a buck knife.

THE COURT: Where was it in the car?

MR. FERLAND: That I don't know.

MR. CROWE: He was not the driver of the car. It's not his car.

MR. SHEA: It is New Hampshire where you actually might use a buck knife for hunting.

MR. FERLAND: I won't mention the knife.

THE COURT: As far as the motion goes, as long as we're here, there's been some testimony about the relationship about not so much that I think it's cumulative. It helps them corroborate Hillary which I think they're entitled to do. I want to know how it's going to be elicited. I want it limited to those sorts of facts.

MR. FERLAND: It's just going to be core fact, Your Honor. It's very brief. I just did a prep, and maybe it took ten minutes.

THE COURT: Okay.

MR. BOOZANG: Judge, can we just address one other issue? The government with their case, I know it's a day-by-day thing and it's a little difficult. We've had a list of witnesses for a few days, and now last night Mr. Wyshak informed us like 5:26 that they were going to call Walt Steffens. Walt Steffens is a pretty important witness in our view and I think the government's as well.

If he was to be direct examined today, I think there's over 400 pages of discovery. I wasn't able to get to them to do a proper cross today. I would ask if he could be held over to Monday at least for cross. If they want to use their time today, fine. But I just don't think we'd be able to properly prepare for that, Judge.

MR. WYSHAK: Your Honor, what had happened was again we're running so far behind with our witnesses. Mr. Steffens came up. We put him in a hotel even though I think the agents had sent him an email that he was being bumped to next week. Since he's here and since we're paying for him to be here, I'd like to get him on the stand now.

My direct to him is 15 minutes. It's a few surveillances. Mr. Boozang is going to try to question him on the induction ceremony again because he was an affiant on that. That's what all that discovery is. It's all about the induction ceremony. I see no relevance of the induction ceremony to this case. There's a few surveillances, and

that's pretty much it.

THE COURT: Let's revisit it after the direct.

MR. BOOZANG: Certainly, Judge.

THE COURT: If they feel like they need to hold him over. You've got Geiger here.

MR. BOOZANG: Thank you, Your Honor.

MR. CROWE: For the record, Your Honor, I think there's more than a few surveillances.

THE COURT: We'll see what happens on direct.

MR. FERLAND: It's a relative term.

THE COURT: Where is he traveling from?

MR. FERLAND: He lives in Chesapeake Bay down in mid Atlantic.

THE COURT: Let's see how it goes. If we get to the cross, and God willing we'll finish this one and move on to another one, we'll see where we are.

MR. BOOZANG: Certainly, Judge. Thank you.

(End of bench conference.)

THE CLERK: All rise for the Jury.

(The Jury enters the courtroom.)

THE CLERK: Court is in session. Please be seated.

THE COURT: So my particular compliments today for getting here on time. I hope no one had to commute on the Pike but today was a monster. It's usually pretty good but today was tough. So thank you for all for being here on

time. Mr. Ferland, when you are ready to resume, you can start. DeLuca, I remind you you're still under oath.

CONTINUED REDIRECT EXAMINATION

BY MR. FERLAND:

**Q.** Good morning, sir.
**A.** Good morning.
**Q.** On Wednesday defense counsel ran through your criminal record with you. Do you recall that?
**A.** Yes.
**Q.** He mentioned an organized criminal gambling case out of Providence Superior Court in 1994. Do you remember that case?
**A.** Yes.
**Q.** A conspiracy and organized criminal gambling?
**A.** Yes.
**Q.** In fact, you were convicted of that offense; is that correct?
**A.** Umm, I pled guilty to it.
**Q.** Correct. And as a result of your plea of guilty you were sentenced to five years suspended sentence as to each count to run consecutive to one another; is that correct?
**A.** Correct.
**Q.** Do you recall receiving a fine of $5,000?
**A.** Yes.
**Q.** Now, back then in '94, was that sort of a standard

sentence that you would receive, or was it a high sentence?
**A.** It was a high sentence.
**Q.** Do you recall, sir, back then in that case who the prosecutor was?
**A.** Yes.
**Q.** Who was that?
**A.** It was Mr. Ferland.
**Q.** Now, while you were on that suspended sentence that they talked about, defense counsel brought up from you the fact that you had been convicted of federal offenses while on that suspended sentence.
Do you recall that?
**A.** I was convicted of a federal case.
**Q.** That's what I said.
**A.** Yes.
**Q.** As a result of that federal conviction --
**A.** Yes.
**Q.** -- did the State of Rhode Island move to violate you on that suspended sentence?
**A.** Yes. After I got sentenced for the federal sentence, they took me to the state and they violated me.
**Q.** And as a result of that violation, did you receive a five-year consecutive sentence to your federal time?
**A.** Yes, I did.
**Q.** And as a result of that, sir, you had to serve time after

your federal sentence was completed; is that correct?
**A.** Yes. I had to go to Rhode Island and serve the five years.
**Q.** Who was the prosecutor on that case?
**A.** It was you, Mr. Ferland.
**Q.** DeLuca, are you and I friends?
**A.** Are we what?
**Q.** Friends.
**A.** Twins?
**Q.** No, sir.
**A.** Friends?
**Q.** Friends.
**A.** Friends like you, I don't need enemies.
**Q.** Now, speaking of your criminal record, did that criminal record hurt you in getting into La Cosa Nostra?
**A.** No.
**Q.** In fact, your criminal record would be sort of a CV or resume. Would that be right?
**A.** True.
**Q.** Did that criminal record hurt you in become being Frank Salemme's right-hand man?
**A.** No.
**Q.** Did it help you?
**A.** Yes.
**Q.** How so?

**A.** That I was a criminal.
**Q.** In fact, La Cosa Nostra is a criminal organization, is it not?
**A.** Positively.
**Q.** Now, yesterday defense counsel asked you about a surveillance that had occurred apparently in North Providence. Do you recall that line of inquiry?
**A.** A surveillance in North Providence?
**Q.** On May 9, 1993.
**A.** Oh, yes. Yes, yes.
**Q.** And counsel asked you if you recalled being at a phone booth in North Providence on that day; is that correct?
**A.** Yes.
**Q.** And he showed you a report; is that right?
**A.** Yes.
**Q.** Now, had you ever seen that report before?
**A.** No.
**Q.** And the question that was asked of you was whether or not you were aware that you were the subject of an FBI surveillance on the 9th of May.
Do you recall that question?
**A.** Yes.
**Q.** Were you aware of that?
**A.** I was aware I was under surveillance constantly.
**Q.** But that specific event were you aware?

**A.** Not that I knew.
**Q.** That's the question. Did you know?
**A.** I knew I was under surveillance, but I didn't know I was under surveillance right there and then.
**Q.** Okay. Now, as it relates to that report that was shown to you, you'd indicated you'd never seen it before. Do you recall though based on your review of that report from yesterday what time of the day it was that the FBI had seen you at that phone booth?
**A.** I think it was early morning if I'm not mistaken.
**Q.** What time of the day was it that Mr. Salemme beeped you to tell you a package would be coming?
**A.** That was late afternoon or early evening, I believe.
**Q.** I see. Now, counsel had asked you concerning the government issuing a subpoena for the phone records from that particular pay phone.
Do you recall that question?
**A.** Yes.
**Q.** Now, certainly you wouldn't have been aware of the government issuing a subpoena for those records, would you have been?
**A.** No.
**Q.** Okay. And you have no idea what the result of the issuance of such a subpoena would have been, correct?
**A.** No.

**Q.** Well, this report that was used yesterday by defense counsel, does it report what the results of that subpoena action was?
**A.** Says they couldn't locate the subpoena in question.
**Q.** Read to yourself quietly.
**A.** Yes. It says -- do you want me to read it to you?
**Q.** No. Just tell the Jury what was the result of that record search?
**A.** The result of that record search was that there were no calls placed during the time period requested, and calls do not appear on telephone records unless it was an operator-assisted call or the pay phone was being studied by New England Telephone.
**Q.** So there were no records --
**A.** No.
**Q.** -- responsive to that subpoena?
**A.** According to that, right.
**Q.** And by the way, what was the scope of that subpoena in terms of the timeframe of the records sought? Does the report indicate that for you?
**A.** The timeframe?
**Q.** Yes, sir.
**A.** On May 21, May 11, June 8.
**Q.** No. The time of day on May 9.
**A.** It was between 9:30 a.m. and 10:30 a.m.

**Q.** So one hour that day?
**A.** Right.
**Q.** At that particular phone booth?
**A.** Correct.
**Q.** Now, yesterday afternoon we spent a great deal of time listening to your recorded prison calls, correct?
**A.** Yes.
**Q.** And in your prep sessions that defense counsel has referenced, were you made aware of the fact that the government had seized those prison calls?
**A.** During when?
**Q.** During the prep sessions that you were asked about. Remember the defense asked you did you meet with the prosecution?
**A.** Yes.
**Q.** And you did meet with the prosecution?
**A.** Yes.
**Q.** My question to you, sir, is during those sessions did the government make you aware of the fact that it had seized your prison calls?
**A.** Yes.
**Q.** Okay. Now, during the playing of those prison calls there was one particular snippet, if you will, that was played for you in reference to the call between your brother Joe and yourself and whether or not you were scheming, so to

speak, to deceive the Jury.

Do you recall that line of questioning?

**A.** Yes.

**Q.** And I think we established yesterday, but I just want to make sure, that you were involved in an extensive interview with the FBI on June 26 of 2016, correct?

**A.** June 26?

**Q.** Yes, sir.

**A.** Yes.

**Q.** All right. And on a number of occasions defense counsel had directed you to the transcription of that interview.

**A.** Yes.

**Q.** Is that correct?

**A.** Yes.

**Q.** And so I'm showing you that document, and I suppose we should mark it for identification.

Do you recognize what that document is?

**A.** Yes.

**Q.** What do you recognize that to be?

**A.** It's a witness statement.

**Q.** And whose witness statement is it?

**A.** Mine.

**Q.** And would you agree with me that that witness statement -- well, I'll pose it as a question. I don't want to lead.

How many questions were posed to you in that transcript?

**A.** 863.

**Q.** And of those 863 questions, was the government and the investigators asking you about the events in which you testified to in this trial?

**A.** About what?

**Q.** The events --

**A.** Yes.

**Q.** -- to which you testified to in this trial?

**A.** Yes.

**Q.** Okay. Now, you would agree with me -- well, again, I'll phrase it as an open-ended question.

MR. WEINSTEIN: Are you marking that?

MR. FERLAND: I am. For identification it will be 601.

BY MR. FERLAND:

**Q.** This interview occurred prior to your being transported to Plymouth County House of Corrections, is that right, before?

**A.** Yes.

**Q.** Okay. Now, we've talked a lot about the conversations you've had with your brother Joe subsequent, that is after, the discovery of the body, correct?

**A.** Correct.

**Q.** In those conversations did Joe tell you that he had appeared before the grand jury in Worcester, Massachusetts?
**A.** I don't remember if he told me.
**Q.** Okay. Do you recall after you were indicted and arrested learning whether or not your brother had testified at the grand jury?
**A.** Yes.
**Q.** Okay. Do you know whether that occurred before you went to Plymouth County House of Corrections?
**A.** I believe it occurred -- yes, it occurred before -- yeah, before I went to Plymouth. Yes, it did.
**Q.** Before you were even arrested. Is that accurate?
**A.** Yes. Yes, yes. Because I remember -- yeah, him telling --
**Q.** Now, in that interview, that 800 and something question interview, did you talk with the government about the fact that you had received a page from Frank Salemme?
**A.** Yes.
**Q.** Did you talk about the fact that he was asking you to be ready to receive a package?
**A.** Yes.
**Q.** Did you talk about the fact that you needed to dig a hole?
**A.** Yes.
**Q.** Did you talk about the fact that Joe, your brother,

wanted to take the brunt and meet with Frank to receive the body in that interview?
**A.** Yes.
**Q.** And did you talk about the fact that a car had been left to receive the body at Tony Lorenzo's jewelry shop?
**A.** Yes.
**Q.** It would be fair to say then that both you and your brother were on the record as to the events in question prior to you being housed at Plymouth?
**A.** Oh, yes.
**Q.** Now, I want to speak to you about a recording, a portion of which was played yesterday which was recorded on October 4 of 2016. For the record it's session number 408, Plymouth County House of Corrections call log, and that was played yesterday by defense counsel.
And in that call, you might remember it, when we played that snippet for you yesterday mentioning Poochie?
**A.** Yes.
**Q.** And I think we covered briefly the fact that Poochie is an individual that you knew to be Poochie Angell; is that right?
**A.** Gaythorne Angell, yes.
**Q.** How is it that you're familiar with Gaythorne Poochie Angell?
**A.** I know him for a lot of years. I knew his father, too.

He's one of the biggest bookmakers around, and he owns a strip club.

**Q.** And what's the name of the strip club?

**A.** Foxy Lady.

**Q.** Now, as it relates to your 1994 conviction for organized criminal gambling in Rhode Island, do you recall whether or not Mr. Poochie Angell was a co-defendant of yours in that case?

**A.** Him and his kids.

**Q.** And you had mentioned in the conversation of the snippet which we played that someone had gone to Poochie Angell's office when they had learned that you were going to be a witness in that case.

Do you recall that?

**A.** Yes.

**Q.** Who was it that went to Poochie's lawyer's office?

**A.** Harpo.

**Q.** That's Mr. Garabedian?

**A.** Charles Garabedian, yes.

**Q.** Your friend of some 50 years?

**A.** Oh, yes.

**Q.** And what was the purpose behind him going to Poochie's lawyer's office?

**A.** Well, he was mad because --

MR. SHEA: Objection. If it's of his own common --

meaning if he participated. But if we're saying what Harpo, could we --

THE COURT: Is this one of those speaking objections that you consistently object to Mr. Wyshak making?

MR. SHEA: We could do a side bar. I was trying to avoid that.

MR. FERLAND: I'll pose another question, Your Honor.

THE COURT: You can stand up and tell me --

MR. SHEA: You're correct. I apologize.

THE COURT: It's fine. Mr. Ferland, make sure that he's talking from his own knowledge.

MR. FERLAND: Understood.

BY MR. FERLAND:

**Q.** Well, did you have a conversation with someone concerning that visit?

**A.** Yes.

**Q.** And do you know as to the timing of Harpo's appearance there what it related to?

**A.** It related to -- Poochie had got arrested for -- he got arrested for something to do with the grand jury.

MR. SHEA: Objection.

THE COURT: What's the basis?

MR. SHEA: Well, he said he's talked to someone, but he's not --

THE COURT: All right. Better foundation, please.
MR. FERLAND: Okay.
BY MR. FERLAND:
**Q.** As it relates to the meeting at Poochie's lawyer's office, did you become aware through public documents such as the newspaper as to whether or not Poochie had encountered a legal problem?
**A.** Yes.
**Q.** And the timing of Harpo's visit to the lawyer's office, did it come before you had learned that he had been indicted or after?
**A.** After he was indicted.
**Q.** As a result of the timing and your relationship with Mr. Garabedian, did you come to a conclusion as to what the purpose of the lawyer's office was?
**A.** Yes. Because after I cooperated with the government, we never talked no more, and he was -- I heard from different people he was mad about it. You know.
**Q.** So you had severed a some 50-year relationship with him?
**A.** Yeah. He wouldn't even talk to my son, which my son was friendly with him. He had nothing to do with it. He was trying to, he was trying to give Poochie's lawyer whatever he could give him because he figured I was going to testify against Poochie.
**Q.** This was to discredit you?

**A.** Yes, yes.

**Q.** Now, who was it, and we listened to the recording yesterday, who was it that keyed you into the fact that this meeting had occurred?

**A.** I think that someone told my brother.

**Q.** Well, in the conversation yesterday we overheard your brother, correct?

**A.** Uh-huh.

**Q.** And I believe he said, "That came from the Pumpkin", correct?

**A.** Yeah, yeah. Okay.

**Q.** So would it be fair to say that the individual who provided the information concerning this meeting was that individual who you have identified as the Pumpkin?

**A.** Yes, yes, yes.

**Q.** Okay. Now, in that conversation with your brother, there seems to be some concern about the fact that the Pumpkin supplied the information coming out. Is that accurate?

**A.** Yes.

**Q.** Why?

**A.** A concern about --

**Q.** You and your brother, your brother simply does not want you to tell the government that Pumpkin is the one who told you.

**A.** So he don't get involved in it.

**Q.** So who doesn't get involved?
**A.** Pumpkin.
**Q.** And why is it you want to keep Pumpkin out of it?
**A.** So they don't know that he told me.
**Q.** Yeah. And why don't you want them to know that he told you?
MR. SHEA: Objection only as to the source. Or we can be seen at side bar if you want me to.
THE COURT: Are you objecting to the "they" in that question?
MR. SHEA: And it's also, as long as he's speaking to -- I believe he's being asked to say why his brother didn't want it to come out, and that would require him to be speaking for his brother.
MR. FERLAND: In the event that there's any --
THE COURT: Just make sure that he's answering based on his own knowledge. Okay?
MR. FERLAND: Correct.
BY MR. FERLAND:
**Q.** The question I am asking you, sir, is you personally, Robert DeLuca, why were you concerned about that.
**A.** I didn't want it coming out as he's the one that told me.
**Q.** I understand that.
**A.** So nobody would know.
**Q.** No one would know what?

**A.** That it was him that told me.
**Q.** Why was it important to you to prevent people from knowing that he's the one who told you?
**A.** Because I didn't want him to get into any trouble or danger for him talking to me after what I'd done with the government.
**Q.** Okay. And is it fair to say that you suspected that this individual was someone who was speaking to the FBI?
**A.** I knew he knew him.
**Q.** In fact, you knew he was somebody who was pretty well known as somebody who talked to law enforcement, correct?
**A.** Yes.
MR. WEINSTEIN: Objection. Leading.
THE COURT: Sustained. Stop leading.
BY MR. FERLAND:
**Q.** Did you know him to be someone who was talking to law enforcement?
MR. WEINSTEIN: Objection.
THE COURT: That one is overruled.
**A.** Yes.
BY MR. FERLAND:
**Q.** Okay. And were you concerned about that fact?
**A.** Of anybody knowing?
**Q.** Yes.
**A.** Yes.

**Q.** Is that why you referred to him under these pseudonyms?
**A.** Yes. I never used his name.
**Q.** Yesterday defense counsel had asked you whether or not your brother and you had worked out your stories together. Do you recall that?
**A.** Yes.
**Q.** And counsel played for you a portion of that Plymouth County House of Corrections session number 243 which had been recorded on 9/16/2016, and he played that to refresh your recollection.
Do you recall that?
**A.** Yes.
**Q.** And do you recall whether there was a conversation that occurred before the clip was played?
In other words, was there some talk between you and your brother before that portion of the tape was played?
**A.** I believe so.
**Q.** Well, I'd like to play a portion of that recording that immediately precedes the clip played by defense. Listen carefully.
(Voice recording played.)
BY MR. FERLAND:
**Q.** When your brother says, "Are they talking about the Eye, too", what does that reference?
**A.** That means Hanrahan.

**Q.** Okay. Explain for the Jury why is he called the Eye.
**A.** Because he only has one eye. He had an eye taken out of him, Hanrahan that got murdered. He only had one eye. So that was his nickname, the Eye.
**Q.** Okay. And when talking to you and your brother here in this context about the Eye, explain what you mean there. What is it that you're talking about?
**A.** The case.
**Q.** Right. But what about the case?
**A.** When's it going to come, when is it going to trial. He's saying it can -- I said sometimes it can take three years, two years, three years, four years, you know.

MR. FERLAND: Keep playing.

(Voice recording played.)

BY MR. FERLAND:

**Q.** When your brother says with just him, and you say "and the kid", who are you referring to? The case involving him and the kid?

Do you want to hear it again?

**A.** That's this case.
**Q.** Okay. And so who is the kid in this case?
**A.** Mr. Weadick.
**Q.** Okay.

MR. FERLAND: Keep going.

(Voice recording played.)

BY MR. FERLAND:

**Q.** And you just said to your brother "and when they get his brother".

**A.** Yes.

**Q.** Who are you referring to there?

**A.** Salemme's brother Jackie.

**Q.** The person that you referred to as Middle?

**A.** Yes.

**Q.** Okay. And what did you mean by that "until they get his brother"?

**A.** Because my brother is trying to tell me, he's trying to say, well, he'll be going to trial next year or ten months or so. And I'm trying to explain to him this could go on and on and on. It could take two years, and then they might wait until they get his brother. And then he's got to, you know, go fight this, that and the other. So it can take three years. They can drag it on as long as they want, you know.

**Q.** When you say they can drag it on --

**A.** The defendants.

**Q.** Okay.

**A.** Not the government.

MR. FERLAND: Go ahead.

(Voice recording played.)

BY MR. FERLAND:

**Q.** When Joe says, "They got to get Paul to roll", who are

they referring to?
**A.** He means Paul Weadick.
**Q.** And what does that mean, they've got to get him to roll?
**A.** He figured if he became a witness, it would be easy to get Jackie.
**Q.** And so to roll would mean to become a cooperator, correct?
**A.** Yeah.
MR. CROWE: Objection.
THE COURT: Sustained. You are leading.
**A.** Yeah.
BY MR. FERLAND:
**Q.** And who are you and your brother talking about who hadn't been charged yet?
**A.** Jackie Salemme.
**Q.** Now, counsel asked you yesterday if you and your brother were concocting this story, right?
**A.** Correct.
**Q.** So how would you be concocting the story, or how would Joe be a participant in concocting the story if he believed that Paul could roll?
**A.** I don't know.
MR. SHEA: Objection. We're getting into what his brother believed, what his brother --
THE COURT: Okay. The first half of that question

is fine. The second half isn't. Rephrase it.

BY MR. FERLAND:

**Q.** Did you believe, yeah, did you believe that your brother earnestly thought that Paul would roll?

MR. SHEA: Objection. It is not what his brother --

THE COURT: Overruled.

**A.** He thought it was a possibility.

BY MR. FERLAND:

**Q.** Okay. And if he thought it was a possibility --

THE COURT: That's sustained. If he thought, that his brother thought it was a possibility.

MR. FERLAND: Understood.

BY MR. FERLAND:

**Q.** And if you believed -- well, did you believe it was a possibility?

**A.** Yeah.

**Q.** And if it was a possibility then, that would mean that you hadn't concocted the story, correct?

MR. CROWE: Objection, Judge.

THE COURT: Stop leading.

MR. FERLAND: I'll move on.

BY MR. FERLAND:

**Q.** During the course of yesterday's cross examination, counsel asked you about whether your loyalty to your brother

was the only reason that you failed to tell the government about your involvement in the DiSarro murder.

Do you recall that?

**A.** Yes.

**Q.** In fact, he asked you if it was the reason you lied about the DiSarro murder was based solely on the fact that you're loyal to your brother.

Do you remember that line of questioning?

**A.** Correct.

**Q.** And he said to you and played for you a snippet of a conversation in which you said, I think it was to possibly Gina, your ex-wife, look, it's 30 percent loyalty to my brother and 70 percent to something else.

Do you recall that line of questioning?

**A.** Yes.

**Q.** All right. And on cross examination, it seems anyways, there were a couple of occasions where you were trying to explain. Is that fair to say?

**A.** Right.

**Q.** All right. You had mentioned that the disloyal -- I'm sorry -- the mistrust was directed at the Rhode Island State Police?

**A.** Right.

**Q.** Okay. Can you explain briefly for the Jury what caused that distrust?

**A.** Because when I started cooperating with them, there's certain things that I had to do. And it was committing a crime, but I felt as though I wasn't because in this life if someone thinks -- if someone knows who you are and they come to you, and they want to shake this guy down. They say, okay, here's what we want to do, I can't say to them I can't do that no more, we can't do this no more, we can't do that no more because what good am I to the government. They're not going to come around me no more when I can't get no more information off them. Do you know what I'm trying to say to you?

**Q.** I do. When was it, though, just so we can figure the timeline because there's a lot going on here. When was it that you started cooperating with the Rhode Island State Police?

**A.** In 2006 I think it was.

**Q.** And where were you when you first started cooperating with the Rhode Island State Police?

**A.** I was in prison.

**Q.** And as a result of your --

**A.** Work release.

**Q.** I beg your pardon?

**A.** I was on work release.

**Q.** Okay. Were you dealing with somebody from the State Police?

**A.** Yes.
**Q.** Did you provide information?
**A.** Yes.
**Q.** Did you work in concert with -- that is to say, did you work together with the State Policemen to develop a plan?
**A.** Yes.
**Q.** Did you feel that certain assurances had been made to you?
**A.** That's what I felt, yes.
**Q.** Did you feel that those assurances had been made to you in bad faith?
**A.** When I got indicted?
**Q.** Yeah.
**A.** Yes, I did.
**Q.** Okay. And is that because you felt you had sort of coverage?
MR. CROWE: Objection, Judge. Leading.
THE COURT: Still leading.
BY MR. FERLAND:
**Q.** Why did you feel that way?
MR. SHEA: Could we approach on this topic?
THE COURT: Yes.
(Bench conference held.)
MR. SHEA: Judge, I believe Mr. Ferland is referring to when -- so my objection is that he seems to be

saying that Mr. DeLuca when he said coverage, that would mean that the Rhode Island State Police had agreed that he could commit crimes, which I believe actually was Bulger's defense. But -- so we have taped transcripts I think of five --

MR. FERLAND: Sure.

MR. SHEA: I'll lower my voice again. Five wires.

MR. FERLAND: Tape recorded conversations of telephone calls.

MR. SHEA: With State Trooper Donnelly.

MR. FERLAND: O'Donald.

MR. SHEA: O'Donald. Sorry. And he makes clear in those conversations you do not have the right to break the law.

THE COURT: I didn't hear him say that. I heard him say just the opposite; that he was committing crimes even though he knew he shouldn't be because otherwise he wouldn't have been of any use to them. That's what I heard him say.

MR. SHEA: But he also thought he had "coverage". So if the government's argument is that he had the agreement to commit crimes, that would not be based on at least the evidence.

THE COURT: I don't hear that to be the government's argument.

MR. FERLAND: No. Because he erroneously, he may have, he may have erroneously thought that they -- by the

way, there's no coverage because that question was struck. So there's no evidence that he thought he had coverage. But the fact remains that he may have misapprehended what his position was with the State Police. That's entirely possible.

But he felt nonetheless betrayed by them because he ends up getting charged. So whether or not it's rational or whether or not it's legally true is irrelevant. He felt that way.

MR. SHEA: The fact that he felt betrayed I'm not objecting to. That's kind of obvious. What I am objecting to is any inference that he did, in fact, have an agreement to break the law.

MR. FERLAND: I'll draw that out if that's necessary.

THE COURT: And I will correct it on an instruction if it's necessary.

(End of bench conference.)

BY MR. FERLAND:

**Q.** Now, just to kind of step back for a second. As it relates to your disappointment with the authorities --

**A.** Yes.

**Q.** What was the event that occurred that caused that disappointment?

**A.** Well, when I was dealing with them, like I said, there

had to be a crime committed here or there, but I remembered that he told me make sure there's no violence. Which at one time there was going to be a bit of violence, and I stopped it. But that was fine because, don't do this, it's going to just cause a lot of heat.

**Q.** But point of fact, didn't he give you a specific instruction you cannot commit crimes without our authorization?

**A.** I believe so.

**Q.** Okay.

**A.** I can explain.

**Q.** Sorry about that. I'm having trouble with leading questions.

Then in the final analysis, you were charged, were you not?

**A.** Yes.

**Q.** Okay. So whatever your thoughts were as to where it would go, you were eventually charged, correct?

**A.** Correct.

**Q.** All right. You were angry about that; is that right?

**A.** Yes.

**Q.** Okay. By the way, the information that you supplied to the State Police starting in 2006, what was the subject matter?

**A.** It was the Cadillac Strip Club.

**Q.** And what specifically about the Cadillac Strip Club?
**A.** The money that was being extorted.
**Q.** Was there any other information that was being passed on concerning that establishment to the State Police?
**A.** Yeah. There was prostitution going on. A lot of different things.
**Q.** Well, let me ask you the question. You were familiar with that establishment, correct?
**A.** Yes.
**Q.** Were you familiar with it when they first opened up?
**A.** When they first opened up I was in prison.
**Q.** Okay. Go ahead.
**A.** I know how they opened up.
**Q.** Well, how did they open up?
**A.** They opened up through Louie.
**Q.** And when you say Louie, who is that?
**A.** Louie Manocchio.
**Q.** Did they have a liquor license when they first opened up?
**A.** They didn't have a liquor license. They had bring your own liquor. And then they kept applying for a liquor license and they couldn't get the liquor license. Then they finally got it. But then I found out from the owner that they paid $150,000 supposedly to get the license through the council, whatever it was.
**Q.** Did you give that information to the State Police?

**A.** Yes, I did.
**Q.** And you said you had conversations with the owner concerning that?
**A.** Yes. I talked to him about. He came to me to tell me about it.
**Q.** Okay. So when you're talking to Gina about your distrust, that's what the background is that leads to that?
**A.** Yes.
**Q.** And yesterday counsel asked you about Gene Carlino. He was spending a lot of time on Gene Carlino. Do you recall those questions?
**A.** Yes.
**Q.** And there was a question that was posed to you concerning if Steve DiSarro had sent -- I'm sorry -- had gone to Carlino for the lumber. Do you recall that question?
**A.** That Steve DiSarro sent me to Carlino?
**Q.** Yes, correct.
**A.** I recall that question.
**Q.** All right. And you said then you had no recollection of saying that, correct?
**A.** No.
MR. SHEA: Page?
MR. FERLAND: Yeah. I'll give you the question numbers. I thought I had it tabbed.
**A.** I said --

BY MR. FERLAND:

**Q.** No.

**A.** Okay.

MR. FERLAND: This would be starting at question 43 and running through question 55.

MR. SHEA: On 6/28?

MR. FERLAND: On 6/28.

MR. SHEA: Thank you.

BY MR. FERLAND:

**Q.** I want you to quietly read that section to yourself.

**A.** The both of them?

**Q.** Yes, sir.

**A.** Okay. Yes.

**Q.** Have you had an opportunity to read it?

**A.** Yes.

**Q.** Just for the record we have now marked this as an exhibit for identification 601.

As it relates to this section of the interview, this portion of the interview --

**A.** Yes.

**Q.** -- who are you talking about from 43 until 53?

**A.** I can see how reading this that when I get down here I just go on to say, "and he asked me to go to Gene Carlino." But I'm talking about Frank Salemme, Sr.

**Q.** How do you know that?

**A.** Because it's all about Frank, and I've done this before and never stopped and said -- if I'm talking about you, I never stopped to say, well, I'm talking about him. Who I started talking about, I just continued it on.
**Q.** Carlino is somebody you know, correct?
**A.** Yes. And I didn't know Steven for him to ask me to go to Gene Carlino, and he would never ask me that.
**Q.** Now, yesterday counsel played you some snippets of a prison recording between you and your brother Joe in which Joe expresses concern that to mention the Pumpkin would blow the whole thing up. Do you recall that?
What is he concerned would be blown up?
**A.** You would be blowing up the Pumpkin. If you mention the Pumpkin, you're going to blow him up.
**Q.** And when he's --
MR. SHEA: He's being asked to testify regarding Joe's concern. Objection.
THE COURT: The question should be what was his understanding of what Joe was concerned about, right? I understood that to be the question, but -- that is the question.
MR. FERLAND: That is the question.
THE COURT: I thought that's what you'd asked. In case you asked something else, that's what you should be asking.

BY MR. FERLAND:
**Q.** What was your understanding as to what Joe was talking about when he said you'll blow the whole thing up?
**A.** It's back to the same thing. Letting him come out.
**Q.** The Pumpkin?
**A.** Yes.
**Q.** And he says that would not be an advantage to us. I think he says a disadvantage, it would be a disadvantage. What is he talking about there?
**A.** Because if he comes out --
MR. WEINSTEIN: Leading again.
BY MR. FERLAND:
**Q.** What's your understanding of what that meant?
**A.** If he comes out, what good is he? We can't talk to him no more.
**Q.** And why do you want to have that ability?
**A.** Because I know his connections.
**Q.** Have you found those connections to be helpful in the past?
**A.** Yes.
**Q.** Did the thing that was going to get blown up, was it this case?
**A.** No. It was him.
**Q.** Was it your relationship with the government that was going to get blown up?

**A.** No.
**Q.** Was it the agreement that you had reached with the government concerning your testimony here?
**A.** No.
**Q.** Sir, on cross examination you were repeatedly asked questions concerning your parole eligibility on the state case. Do you recall that?
**A.** Yes.
**Q.** I believe counsel identified the actual Rhode Island general law that governs parole. Do you remember that during examination?
**A.** Correct.
**Q.** And statutorily an inmate in the Rhode Island system, according to the statute as read by counsel, is eligible for parole in a third; is that correct?
**A.** Correct.
**Q.** All right. Now, you've been through the Rhode Island state system, have you not?
**A.** Correct.
**Q.** Are you aware of the fact that the Rhode Island Parole Board has its own internal guidelines separate and apart from the statute?
**A.** Yes.
**Q.** And do you know how much of a sentence you have to serve in Rhode Island if the crime is a crime of violence or if you

are a repeat offender or if you have been on a previous suspended sentence and violated?

**A.** I wasn't sure, but I asked you that question.

**Q.** Well, I'm asking you if you understand it.

**A.** Yes. I understand.

**Q.** Not based on anything that I've told you. Did you have prior understanding?

**A.** Oh, yes, I did.

**Q.** You've been paroled previously before; is that correct?

**A.** Yes. Yes.

**Q.** Was it after you had served a third of your sentence or right at a third?

**A.** Me?

**Q.** Yes, sir.

**A.** No.

**Q.** Okay.

**A.** No.

**Q.** Now, let me ask you this: Is there parole in the federal system?

**A.** No.

**Q.** No?

**A.** No.

**Q.** And you've already testified that the sentence you received would run concurrent with the federal sentence; is that correct?

**A.** Correct.
**Q.** So even if the State of Rhode Island paroled you out in a third, you're doing your time in the Federal Bureau of Prisons, correct?
**A.** Yes.
**Q.** The reason you're detained is because you're charged with lying to the government, correct?
**A.** Correct.
**Q.** And the thing that you lied about was whether or not you were involved in the murder of Steven DiSarro; is that correct?
**A.** Correct.
**Q.** So if you lie and you admit you lied, then you were, in fact, involved in the murder of Steven DiSarro; is that correct?
MR. WEINSTEIN: Objection.
THE COURT: Stop.
**A.** Yes.
THE COURT: Stop leading the witness.
BY MR. FERLAND:
**Q.** Would that mean that you were logically then involved in it?
THE COURT: Mr. Ferland, that is a leading question. When the answer sought is in the question, that's a leading question.

MR. FERLAND: Very well, Your Honor. I'll rephrase the question.

THE COURT: Perfect.

BY MR. FERLAND:

**Q.** Was there any other murder that you lied about to the government?

**A.** Yes.

**Q.** And which one was that?

**A.** Hanrahan.

**Q.** The Eye?

**A.** The Eye.

**Q.** Correct?

**A.** Correct.

**Q.** And that's the one that you told us about on direct examination, correct?

**A.** Correct.

**Q.** Mr. DeLuca, going back to the Pumpkin and your concern about him being blown up, did you -- did you personally think that if you told him something he would provide information to law enforcement?

**A.** I believed that.

**Q.** Did you ever deliberately tell him things sort of knowing that it would get to law enforcement?

**A.** Yes.

**Q.** If you outed him, would you be able to do that anymore?

**A.** No.
**Q.** Do you know, if you know, did your brother Joe ever knowingly provide information to the Pumpkin designed to get to law enforcement?
**A.** Yes.
**Q.** Did he?
**A.** Yes.
**Q.** So you had -- let me ask you this: How would you characterize your relationship with the Pumpkin?
**A.** Good, very good.
**Q.** Would you find it somewhat unusual or unique, the relationship?
**A.** Unique?
**Q.** Unique, unique.
**A.** I don't know. I can't -- it's a good relationship.
**Q.** I understand that you find it to be a good relationship. But you would agree that it's a little different, wouldn't you?
**A.** Oh, because of me and him, yeah.
**Q.** You're a bad guy, right?
THE COURT: Mr. Ferland --
MR. FERLAND: Sorry. Never mind. One second.
THE COURT: While they're conferring, here's a little procedure for you. When a witness is on direct examination, they cannot be asked leading questions. In

other words, the question can't suggest the answer. When a witness is on cross examination or that witness is hostile to the person that's asking the questions, you can ask leading questions. In other words, questions that suggest the answer sought.

BY MR. FERLAND:

**Q.** Earlier you had described for us your involvement in the 2011 investigation.

**A.** Yes.

**Q.** And the fact that your sentence was imposed after the resolution of those cases that you had helped build. Do you recall that?

**A.** Yes.

**Q.** Was there any concern on your part that sort of exposing the Pumpkin would affect those cases?

**A.** I really didn't know. Maybe. You know, I couldn't say yes. I couldn't say no. You know what I mean?

**Q.** Okay. So the main concern was the individual himself?

**A.** Yes.

THE COURT: Mr. Ferland.

MR. CROWE: Objection, Judge.

BY MR. FERLAND:

**Q.** What was the main concern?

**A.** To him all the time, it's --

MR. SHEA: Objection. Can we be seen on side bar

on that particular issue? Not the leading but the area he's trying to get into.

THE COURT: Are you done with this area?

MR. FERLAND: Yes.

MR. SHEA: I'll wait then. That's fine.

MR. FERLAND: I have no further questions.

RECROSS EXAMINATION

BY MR. WEINSTEIN:

**Q.** 601 for identification. Good morning, Mr. DeLuca.

**A.** Morning.

**Q.** While we're waiting for 601, did you have opportunity to meet with prosecutors after court yesterday?

**A.** Yes, one.

**Q.** And was that to prepare for the questions that a prosecutor would be asking you here this morning?

**A.** No.

MR. WEINSTEIN: Thank you.

BY MR. WEINSTEIN:

**Q.** At the beginning of the prosecutor's questioning with you yesterday, he said, "I want to set a timeline for the Jury." And you answered yes. And he went on to say to you, "The statement that you have been shown repeatedly, the June statement", and you questioned "the what?"

"Question: The June statement down in Florida.

"Yes.

"When was that statement taken from you in relationship to your arrest?

And you answered, "The same, maybe three hours later, two hours later." Correct?

**A.** Correct.

**Q.** Now, you were arrested on June 27 of 2016, correct?

**A.** I don't remember.

**Q.** Well, the day that you were arrested when Mr. Braga from the FBI brought you along with other members of the arrest team to the Broward Sheriff's Office --

**A.** Yes.

**Q.** You spoke with them for a short amount of time, right?

**A.** Correct.

**Q.** And you informed them that you would not answer any of their substantive questions until Dore, your lawyer, was with you?

**A.** Correct.

**Q.** And so the reference to the taped statement that you were asked about that you said was only three hours after your arrest, is that what you were referring to when you said that?

**A.** No. I thought I got questioned by them the same day.

**Q.** Well, you were shown Exhibit 601 for identification. Do you see that?

**A.** Yep.

**Q.** And the date?
**A.** Yep.
**Q.** 601 for identification per stipulation that was read to the Jury yesterday was a transcript of your interview on June 28 of 2016, correct?
**A.** Correct.
**Q.** So when you were asked questions by the prosecutor to set a timeline, in fact, the timeline of your in-depth substantive interview begins on June 28, does it not?
**A.** Correct.
**Q.** And when you were asked questions earlier today by the prosecutor and he suggested the date of June 26 or June 27, you just agreed with him that that was the date, did you not?
**A.** I thought I got arrested on June 26.
**Q.** And did you just agree with him because, after all, that's the prosecutor, and if he's asking you the questions this morning, it's best that you simply roll along and agree with what he's saying to you?
**A.** No. I agreed with him because that's my memory.
**Q.** But you know now specifically --
**A.** Now I know.
**Q.** -- that the long interview was on June 28, right?
**A.** Correct.
**Q.** That's the one where you spoke in depth with Dore by your side?

**A.** Correct.
**Q.** And that's the one when Mr. Cady, the other FBI agent from Rhode Island, came down to the meeting, correct?
**A.** Yes.
**Q.** And that's the meeting where Mr. Ferland, the prosecutor, came down for that process and the interview?
**A.** Right.
**Q.** And that was how many months after the FBI had dug up Mr. DiSarro's body from Ricci's property?
**A.** I really don't know. I can't tell you that.
**Q.** Do you remember that you first learned about it from the media or from some other source? Which was it?
**A.** Either one.
**Q.** And you talked about it with your brother Joe at the time that the FBI was on Branch Ave., right?
**A.** I might have asked him what's going on.
**Q.** Because you were curious?
**A.** What's that?
**Q.** Because you were curious. You asked Joe what's going on because you were curious, correct?
**A.** Yeah.
**Q.** And concerned?
**A.** Yes.
**Q.** And that all took place at the end of March 2016, correct?

**A.** If that's when it was.

**Q.** And your interview is now at the end of June 2016, correct?

**A.** Correct.

**Q.** Plenty of time for you and Joe to get your stories straight, correct?

**A.** There was no story.

**Q.** You were asked a little while ago this morning about a gambling case in Rhode Island that the sentence ran consecutive to a sentence you picked up in the federal court in Massachusetts.

**A.** Yes.

**Q.** That federal case was a case that was -- it took a lot of time, didn't it? A lot of hearings in that case before Judge Wolf?

**A.** Yes.

**Q.** And that's the case where Stevie Flemmi was claiming that he had license to commit crimes, that license given to him by FBI agents in Boston, correct?

**A.** Yes.

**Q.** And he had license to commit crimes given to him by the then head of the Justice Department's organized crime strike force here in Boston, correct?

**A.** Yes.

**Q.** And you sat through those hearings while Mr. Flemmi gave

testimony about that understanding that he operated under based upon what he said was permission for him to commit crimes, permission given by the FBI and an official from the Justice Department, right?

**A.** Correct.

**Q.** And eventually you pled guilty in connection with that indictment, did you not?

**A.** Yes.

**Q.** And that's the one that Mr. Ferland, the prosecutor, was referring to about the federal case, correct?

**A.** No.

**Q.** You pled guilty to an indictment that was called the fourth superseding indictment, correct?

**A.** Yes.

**Q.** And you pled guilty to eight counts of that indictment?

**A.** Yes.

**Q.** You were sentenced by Judge Wolf to 34 months of federal prison time, correct?

**A.** No. It was more than that.

MR. WEINSTEIN: Well, I'm going to move into evidence -- actually let me show it first on the display.

BY MR. WEINSTEIN:

**Q.** Do you see this document, Mr. DeLuca?

**A.** Yes.

**Q.** Do you see it has your name as the defendant?

**A.** Yes.
**Q.** And it's called the Judgment in a Criminal Case?
**A.** Yes.
**Q.** And I've affixed an Exhibit No. 511 to that document?
**A.** Yes.
**Q.** It's Judge Wolf?
**A.** Yes.

MR. WEINSTEIN: I move that into evidence.

MR. WYSHAK: Objection.

THE COURT: Is that objection or no objection? Three words or less.

MR. WYSHAK: Rule of completeness.

THE COURT: Is that the complete document?

MR. WEINSTEIN: Yes.

MR. WYSHAK: Well, not complete without the indictment to which the counts relate.

THE COURT: All right. Can we move in the indictment as well?

MR. WEINSTEIN: Sure.

MR. WYSHAK: No objection.

THE COURT: Mr. Weinstein, 511 is already taken. How about 512?

MR. WEINSTEIN: Sure. I'll just change the number, remove the sticker.

THE COURT: And then we'll make the indictment 513.

MR. FERLAND: Your Honor, I did note there's some PII on that that will have to be redacted.

THE COURT: He's talking about personal identifying information.

MR. WEINSTEIN: I would suggest that we clean it all up. I'm not going to read it or anything like that.

THE COURT: Yes. Before it goes back to the Jury, we'll clean it all up. The two exhibits will both come in, the judgment and the indictment or the information, whatever it is.

(Government Exhibit No. 512 admitted.)

MR. WEINSTEIN: I'll offer it as one complete document numbered 512.

BY MR. WEINSTEIN:

**Q.** You pled guilty to a number of counts that are reflected by the judgment that is now part of Exhibit 512, correct?

**A.** Right.

**Q.** Correct?

**A.** Correct.

**Q.** You pled guilty to counts that included interference in commerce by threats or violence. Yes?

**A.** What's ever on there I pled guilty to it.

**Q.** Sports bribery?

**A.** Yeah.

**Q.** Racketeering?

**A.** Yeah.
**Q.** Interstate travel in aid of racketeering?
**A.** Yes.
**Q.** And the sentence you got was by an agreement between you, your lawyer, and the U.S. Attorney's Office?
**A.** Yes.
**Q.** And that was a sentence of 34 months?
**A.** No.
**Q.** No fine was assessed on you, correct?
**A.** No.
**Q.** That's from the judgment that's now part of the exhibit. "The sentence will be imposed in accordance with the prescribed forms in the Bench Book Section 5.02 as follows: 34 months imprisonment to run concurrently with the sentence DeLuca is now serving."
Do you see that?
**A.** That's the original sentence which --
**Q.** That's what I asked you, sir. That's the sentence that was imposed?
MR. FERLAND: Objection.
THE COURT: Let him finish, please.
**A.** That's not the original sentence. The original sentence I think was nine and a half or ten years, and I was already serving that sentence. It started running concurrent with it. The balance of that sentence, this 34 months ran

concurrent with. He gave me credit for the time I already had in while I was fighting the case.

BY MR. WEINSTEIN:

**Q.** And he didn't impose any kind of fine on you?

**A.** No.

**Q.** And you know, do you not, that while there is no parole in the federal sentencing scheme, correct?

**A.** Yes.

**Q.** There is something called good time?

**A.** Yeah.

**Q.** And so that you know serving a federal sentence that you don't serve every day of the sentence imposed but rather you should get out at about 85 percent of the term that the judge gives you?

**A.** Yeah, around there.

MR. WEINSTEIN: I have no other questions.

RECROSS EXAMINATION

BY MR. SHEA:

**Q.** Good morning.

**A.** Good morning.

**Q.** So just for the witness. So do you see this document, sir?

**A.** Yes.

**Q.** It's a document of an audio recording, correct?

**A.** Yes.

**Q.** Do you see your name in the lower left-hand corner?
**A.** Yes.
**Q.** It's June 27, correct?
**A.** Correct.
**Q.** 2016, correct?
**A.** Yes.
**Q.** At 7:30 a.m., right?
**A.** Correct.
**Q.** Okay. And that's the day that you were arrested, correct?
**A.** Yes.
**Q.** You met with the officers that morning, right?
**A.** Correct.
**Q.** And that's what you just testified, you requested your lawyer, correct?
**A.** Correct.
**Q.** Okay. Now, I know Mr. Ferland showed you questions 43 I believe it was through 53 from the June 28, 2016. Again just for the witness, question 53 by itself.
**A.** Uh-huh.
**Q.** The questions at that point are kind of mm-hmm's like you just did, right?
**A.** Yeah.
**Q.** And you're speaking, correct?
**A.** Correct.

**Q.** And the answer to question 53 was, "And I was probably at that club maybe two or three times." Correct?
**A.** Correct.
**Q.** "They were remodeling it, and, you know, I seen Steven a couple of times just to say hello."
**A.** Correct.
**Q.** "And he asked me to go to Gene Carlino."
**A.** Correct.
**Q.** "You know, Gene Carlino." Correct?
**A.** Correct.
**Q.** Thank you. You were just asked about the timeframe of when you had learned about things, meaning Mr. DiSarro's body being dug up at Billy Ricci's place.
**A.** Yes.
**Q.** And do you recall in the first day of your testimony, page 103, you were asked, some time early in 2016 -- sorry. "Some time early in 2016 you learned that the FBI was digging in the ground behind Billy Ricci's property in North Providence, Rhode Island, didn't you?"
And that you answered yes.
**A.** Yes.
**Q.** So and then you said in response to other questions that in March you may have been talking to your brother Joe every day, correct?
**A.** Correct.

**Q.** And I think you testified that you talked to your family members almost every day, right?
**A.** Almost every day.
**Q.** Okay. And so some time in early 2016 you know that Mr. DiSarro's body is unearthed at Billy Ricci's. And 6/27 you're arrested, correct?
**A.** Mm-hmm.
**Q.** Okay. Those phone calls, those communications with Joe that took place on an almost daily basis before you got arrested on 6/27/2016, those weren't taped, were they?
**A.** No.
**Q.** We don't have any recording or transcript of those, correct?
**A.** Do I?
**Q.** Yeah.
**A.** No.
**Q.** And you and Joe in that timeframe talked about the fact that that body was going to come back to you, correct?
**A.** Possibility.
**Q.** Well, more than a possibility, right? Because you knew Billy Ricci was cooperating, isn't that right?
**A.** If they're digging the body, yeah.
**Q.** Okay. Meaning when you see that they're digging the body at his place, you assume he's the one talking, right?
**A.** Correct.

**Q.** Okay. And so -- and he's going to be the one -- he's going to put the body on you and Joe because you're the guys -- you went to him about the hole, right?
**A.** Yes.
**Q.** Joe goes to him with the body, right?
**A.** Correct.
**Q.** Okay. So in those months you and Joe know that you're about to get put with the body, right?
**A.** I know I am.
**Q.** Well, and you know that he -- so Billy Ricci is not going to mention Joe?
**A.** Yeah, I guess so.
**Q.** You're guessing he'd mention him. Didn't you just testify, it's been days now, under oath that Joe is the one that brought the body over to Billy Ricci's place?
**A.** Yes.
**Q.** And didn't you testify that Joe actually went to redig or unearth the body from Billy Ricci's place?
**A.** Correct.
**Q.** And now you're testifying that you guess that Billy Ricci might put Joe with the body?

MR. FERLAND: Objection. He's doing the exact same thing he accused me of doing, speculating as to what Billy Ricci thinks or would do.

THE COURT: I got it. Sustained.

BY MR. SHEA:
**Q.** Didn't you say, I guess so, that Joe might be linked to it.
**A.** Yes.
**Q.** Not what's in Joe's mind, as Mr. Ferland rightfully points out, but what was in your mind. Meaning -- and I assume you weren't saying in your mind I guess so that he might find himself in it?
**A.** That's a matter of saying, of course he's going to say Joe, too.
**Q.** So of course you and Joe know you're about to be in on a murder, right?
**A.** Correct.
**Q.** And it's better to be, as you've shown some legal acumen here, it's better to be an accessory after the fact, it's better to be the person just disposing the body than it is the murderer, isn't it?
**A.** It's better than being a murderer, yes.
**Q.** And that's what you and Joe describe yourselves as, isn't it?
**A.** No. We didn't describe ourselves as nothing.
**Q.** Okay. Now, Mr. Ferland took you through one of the tapes with your brother and had you explain the Pumpkin a little bit, correct?
**A.** Correct.

**Q.** And you talked about you and Joe were talking about withholding information from the government, correct?
**A.** Withholding?
**Q.** Withholding, not sharing. Like when you say, "We ain't telling nobody nothing", the nobody you're telling nothing is the government who you're talking to, right?
**A.** Not necessarily. Why does it mean the government?
**Q.** Let's break it down.
MR. FERLAND: Objection. We've covered this area thoroughly on cross examination yesterday. It's the exact same area.
MR. SHEA: I'm only going over the area that he just went over.
THE COURT: Do it quickly because we can all recite this tape verbatim now. Okay?
MR. SHEA: Okay.
THE COURT: Go ahead.
BY MR. SHEA:
**Q.** Well, when you're talking about not telling nobody nothing --
**A.** Correct.
**Q.** You never met with me, right?
**A.** No.
**Q.** Did you ever meet with Mr. Weinstein?
**A.** No.

**Q.** The gentleman back here, Mr. Cady, have you met with him?
**A.** Yes.
**Q.** A number of times, right?
**A.** Right.
**Q.** Mr. Braga, these special agents, have you met with them?
**A.** Yes.
**Q.** Okay. The gentlemen who are representing the government here, have you met with them?
**A.** Both of them.
**Q.** Okay. So when you're talking to your brother about the people you're going to tell nothing, the people you're not going to share that information with, the people you're going to withhold information from, you're talking about the people that you're actually talking to, the government, correct?

MR. FERLAND: I object to the form of the question. What information? What specific information?

BY MR. SHEA:
**Q.** Well, let's go into that. He took you into a little bit about Poochie, right?
**A.** Yeah.
**Q.** And part of what you and Joe are talking about is -- and I'm not going to play the tape for you today, okay? I'm going to try and move more quickly.

But you and Joe are talking about the fact that it can -- this information, part of it -- and you guys are

talking about a lot of different information, correct, when you're talking?

**A.** I don't know. We're talking about Poochie at the time, I believe.

**Q.** At different times you're talking about Poochie. At different times you're talking about the car, right? You talk about different things.

**A.** Go ahead.

**Q.** Joe and you, and I think Mr. Ferland talked on this exactly, that if you exposed the Pumpkin that it would affect these cases I think was what Mr. Ferland said, correct, meaning the cases back in 2011?

**A.** He asked me if it would.

**Q.** Right.

**A.** And I said no, I believe.

**Q.** Your view was it wouldn't affect the cases, right?

**A.** Correct.

**Q.** Okay. But you and Joe had long conversations about how it might affect the cases, right?

**A.** Not --

**Q.** Meaning you felt that it wouldn't affect the cases because the thing that you and Joe agreed on was that Pumpkin had withheld information from the government that was part of what underlay the convictions in 2011; isn't that right?

MR. FERLAND: Objection.

**A.** Never.

THE COURT: Hold on a minute.

THE WITNESS: Oh. I'm sorry.

MR. WYSHAK: We'll withdraw it.

THE COURT: Go ahead.

BY MR. SHEA:

**Q.** So you said never?

**A.** Did I think that he would --

**Q.** Meaning you're saying, you and Joe are talking about the fact, and Joe is saying to you if the Pumpkin comes out, it's going to show that these convictions, the information he withheld, it's going to affect the convictions. But he specifically, not to be personal, but he specifically references that Bill Ferland is going to be upset because it's going to undercut his convictions.

MR. WYSHAK: Objection to the form of this.

THE COURT: Sustained.

BY MR. SHEA:

**Q.** Do you recall that, sir?

**A.** No.

**Q.** And do you recall that you said I'm not worried about it because they pled guilty? Do you recall that?

**A.** No.

**Q.** Okay. Now, Mr. Ferland showed you what's been marked as government Exhibit 361, correct?

**A.** Correct.

MR. FERLAND: No objection to that being full, by the way, Your Honor.

MR. SHEA: I'm not sure my brother counsel has seen it. I don't have a particular objection. We'll sort it out.

THE COURT: I don't know what exhibit it is at this point.

MR. SHEA: Okay. If no one has an objection, let's make it an exhibit. Then the Jury can see what I'm working.

THE COURT: Government, do you have an objection?

MR. FERLAND: No, Your Honor.

MR. WEINSTEIN: There's no objection.

THE COURT: All right. It's admitted.

(Government Exhibit No. 361 admitted.)

BY MR. SHEA:

**Q.** Let's take it from the top. May 9, 1993, you're observed at these pay phones at Douglas Drug. We established yesterday that one of the banks of phones you went to was this one at Douglas Drug, right?

**A.** Correct.

**Q.** It was one of the ones you listed as a possibility of where you got the alleged -- went to after getting the beep supposedly, correct?

**A.** Correct.

**Q.** Okay. One thing when Mr. Ferland just talked to you

about this that he left out, and it's the next to last paragraph, and it's a few sentences down. In here, Bourne, meaning the person from the phone company, "explained that local calls do not appear on the telephone records." Right?

**A.** Correct.

**Q.** And so it wasn't that there were no records, right? If it was a local beeper number or a local beeper there would be no records, right?

**A.** Correct.

**Q.** And so you knew Mr. Salemme to have an out-of-state beeper number, correct?

**A.** I believe so.

**Q.** Well, you never knew him to live in Rhode Island, did you?

**A.** No.

**Q.** So fair reading of that if there were an out-of-state call, then there would be records. That the reason there were no records was that it was a local call, correct?

**A.** It says if you have to use an operator.

**Q.** Right. Then it might register a local call. You didn't use an operator, did you?

**A.** You never use an operator. You don't have to use an operator.

**Q.** Okay. And the timeframe for you on these calls has been fuzzy, correct?

**A.** What do you mean by fuzzy?

MR. WYSHAK: Object to the form of the question. Which calls is he referring to?

MR. SHEA: Sure.

BY MR. SHEA:

**Q.** For instance, you've alleged that there was I think two beeps regarding the DiSarro body?

**A.** Correct.

**Q.** One would be for meeting you at Christina's, correct?

**A.** Correct.

**Q.** And the second would be for telling you that there was a package and he wanted it buried, correct?

**A.** Correct.

**Q.** Okay. And so both of those things were subjects of questioning, correct? You were asked about them. Do you remember that?

**A.** Not really.

**Q.** Okay. Well, I mean, you were asked about them at the trial, right, meaning page 70?

And what's interesting, Mr. Ferland says when we get to this area, he says, "I want to direct your attention now to May of '93. Did you receive further instructions or an assignment from Frank Salemme, Sr.?"

And you say with a question mark to follow. "In May of '93?"

Mr. Ferland tells you, yes. And you answer, yes. Do you recall that?

**A.** Yes.

**Q.** Okay. Now, when you gave your witness statement in June 28 of 2016, you were asked about how long after the conversation regarding DiSarro taking money. So just relocate things. I'm trying to move it along, Judge.

Christina's is the place you say you have the conversation with Mr. Salemme where he tells you DiSarro's taking money, right?

**A.** Right.

**Q.** And so the government asked you, "How long after that conversation regarding DiSarro taking money?" Okay? And you said, Get rid of him but don't kill him, right? That's your -- right?

**A.** Right.

MR. WYSHAK: Objection.

MR. FERLAND: Objection. The characterization. In fact, I move to have -- I move to have 601 admitted as full, the transcript of the interview.

THE COURT: Any objection?

MR. SHEA: Yes.

THE COURT: You have an objection to that?

MR. SHEA: The entire transcript from 6/28?

MR. FERLAND: Yes.

THE COURT: We'll take that up later. Go. The last question was a compound question. So ask one question.

MR. SHEA: You're correct.

BY MR. SHEA:

**Q.** The point is, sir, you are asked to locate in time that first conversation at Christina's and the timeframe between the conversation at Christina's and the beep regarding the DiSarro body.

Do you recall that?

**A.** Correct.

**Q.** And when you were first asked that question, you say, "I don't know how long after that, I don't know how long after that we got a beep. I got a beep that night and my brother Joe was with me."

MR. WYSHAK: Objection. This is way beyond the scope of redirect examination.

MR. SHEA: No. It's actually --

THE COURT: Get to it.

MR. SHEA: I am.

BY MR. SHEA:

**Q.** But you answered them essentially you didn't know how long between those two, right?

**A.** I don't know how I answered the question.

**Q.** Just for the witness. If you want I can start on the bottom of the other page. All right? Okay?

**A.** Yeah.
**Q.** You see that part? We'll go over to the next page.
That's accurate, sir, right?
**A.** Yeah. Yeah.
**Q.** You're saying, "I don't know how long after that, how long after we got the b -- I got the beep that night, that my brother Joe was with me." Right?
**A.** Correct.
**Q.** So you're telling them there you don't know how long after, right, between those two.
And then the questioner says to you, "Now, we're not talking months after."
**A.** Yeah.
**Q.** Meaning not months between Christina's and the beep with Joe, right?
**A.** Right.
**Q.** And you answer, "I couldn't -- I can't answer that question, Jeff." Meaning Mr. Cady, Special Agent Cady?
**A.** Yeah.
**Q.** "I really can't put it together. If I do I'm lying to you." Right?
**A.** Right.
**Q.** So you're saying you couldn't put together the timeframe, the gap between those two things, right?
**A.** Right. At that time.

**Q.** And then in the same transcript, questions 287 to 290. Read question 287 to yourself. All right?

So this is in the same conversation from the questions I just asked you.

**A.** Right.

**Q.** And again they're just asking you if you can tell them the timeframe difference between the meeting with Mr. Salemme at Christina's and the time you get the beep for the package, correct?

**A.** Correct.

**Q.** And inside that question at the end of the question, it's, "Was it days, weeks, or months?" Correct?

**A.** Correct.

**Q.** And you answered, "I don't think it was months. I told you, I can't -- I can't swear to you."

The question, "So it was more than?" And you say "eh".

The question, "Less than -- it wasn't months, but it was more than like a day. It wasn't like the next day."

You answer, "No, no, no."

They say, "Okay." You say, "No, it was not."

Right?

**A.** Correct.

**Q.** And so they're trying to locate the time, and you're still having trouble, right?

**A.** Yep.
**Q.** And they're suggesting that it's not months, right? And then you come to trial.
MR. FERLAND: I object to the form of this question.
THE COURT: It's not even a question. It's a speech. Stop. Ask your questions.
MR. SHEA: All right.
BY MR. SHEA:
**Q.** They're trying to suggest a date, a timeframe, right?
MR. FERLAND: Objection.
THE COURT: Sustained.
BY MR. SHEA:
**Q.** Are the questioners on 6/28/16 suggesting to you whether it was months, days, or weeks?
MR. FERLAND: Objection.
THE COURT: Sustained.
BY MR. SHEA:
**Q.** Is it fair to say, sir, that you couldn't put a timeframe together for between the Christina's meeting and the beep for the package?
**A.** At that point I couldn't. I was thinking about it.
**Q.** Okay. And then when you got here to trial, the government in its questioning suggested a timeframe that you adopted, correct?

**A.** No. I told them before trial.
**Q.** But in the question itself it's Mr. Ferland's question that locates the timeframe in May, isn't it?
**A.** No.
**Q.** Well --
MR. SHEA: Last thing, Judge.
BY MR. SHEA:
**Q.** Question: "I want to direct your attention to now May of 1993. Did you receive instruction or another assignment --
MR. WYSHAK: How about reading the whole thing?
MR. SHEA: This is the trial transcript.
MR. WYSHAK: It says "received further instructions".
MR. CROWE: You left "further" out.
BY MR. SHEA:
**Q.** I'm sorry. "Did you receive further instruction or another assignment from Frank Salemme, Sr.?" And in that question is May of 1993, right?
**A.** Yeah.
**Q.** Okay. And then your answer with a question mark following it is, "In May of '93?"
**A.** I wanted to make sure I heard the question right. I'm not asking him if that's what he said. I wanted to hear it right.
**Q.** And then he says yes and you say yes?

**A.** No. I wanted to make sure I hear the question.
**Q.** I understand that's your response now.
**A.** It wasn't a question that I'm asking him back. I wanted to make sure I heard the question from him correct.
**Q.** Just read -- and then it's a yes and a yes.
MR. FERLAND: Objection. He's answered this.
MR. SHEA: Judge, we would move the phone calls, the portions of the phone calls that I used yesterday in cross examination into evidence.
MR. FERLAND: For i.d. there's no problem with that.
MR. SHEA: I'd like to move it in fully into evidence as an exhibit.
MR. FERLAND: Then under the rule of completeness we would request that the entire recording be in.
THE COURT: We'll sort it out during the break. Do you have any further questions?
MR. SHEA: No. Thank you.
THE COURT: All right. You're excused, Mr. DeLuca.
THE WITNESS: Thank you, Your Honor.
(Witness Robert P. DeLuca, Jr., is completed.)

\- - - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/ Joan M. Daly                                        June 1, 2018

______________________                        ____________________

Joan M. Daly, RMR, CRR                          Date
Official Court Reporter