# United States Court of Appeals
## For the First Circuit

―――――――――――

Nos. 18-1899, 18-1933

UNITED STATES,

Appellee,

v.

PAUL M. WEADICK,

Defendant, Appellant.

―――――――――――

No. 18-1932

UNITED STATES,

Appellee,

v.

FRANCIS P. SALEMME,

Defendant, Appellant.

―――――――――――

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

―――――――――――

Before

Kayatta and Barron, Circuit Judges,
and Smith, District Judge.*

―――――――――――

   Mark W. Shea, with whom Shea and LaRocque, LLP was on brief,
for appellee Weadick.

―――――――――――

   * Of the District of Rhode Island, sitting by designation.

Lawrence Gerzog for appellee Salemme.

Randall Ernest Kromm, Assistant United States Attorney, with whom William J. Ferland, Assistant United States Attorney, Donald C. Lockhart, Assistant United States Attorney, and Harvey Smith, Office of General Counsel, U.S. Marshals Service, were on brief, for appellant.

---

September 24, 2021

---

**KAYATTA**, **Circuit Judge**.  Francis P. Salemme and Paul M. Weadick were tried and convicted of murdering Steven DiSarro in 1993 in order to prevent DiSarro from talking with federal agents about his activities with Salemme, Weadick, and Salemme's son, Frank Jr.  See 18 U.S.C. § 1512(a)(1)(C).  At the time of the murder, Salemme was the boss of a criminal organization known as the New England La Cosa Nostra ("NELCN").

The principal issues on this appeal arise from the admission at trial of a large amount of evidence concerning the prior criminal activities of Salemme and several witnesses. Weadick complains, among other things, that by trying him jointly with Salemme and then introducing evidence covering three decades of crimes by Salemme, the government deprived him of a fair trial. Salemme, in turn, argues that much of that evidence about his past was inadmissible hearsay or propensity evidence.  For the following reasons, we reject these contentions and the other challenges raised in this appeal.

**I.**

In 1992, DiSarro bought a closed nightclub in Boston with funds he received from Frank Jr.  Because DiSarro was under investigation at the time, the papers listed DiSarro's stepbrother as the owner.  Frank Jr. was kept on the books as a part-time manager, which allowed him to avoid a full curfew as a condition of pre-trial release following his arrest on labor racketeering

charges.  Weadick, a close friend of Frank Jr., was hired as a night manager.  Weadick and Frank Jr. had a history of ripping off drug dealers together, knowing that the specter of the NELCN would deter any retaliation.

In March of 1993, a federal agent approached DiSarro, telling him that he was under investigation and asking him to cooperate.  Upon hearing this news, Salemme voiced concern that DiSarro would implicate Frank Jr. and eventually Salemme himself. Weadick expressed similar concerns to Frank Jr.  Around the same time, Frank Jr. and Salemme also told others that they suspected DiSarro of stealing from the nightclub.  Having trouble getting a meeting with DiSarro, Weadick and Frank Jr. discussed inviting him to Salemme's house to make him feel safe.

Soon thereafter, DiSarro was approached by another federal agent, who told him he had been indicted, and, for the second time, asked him to cooperate with the government.  DiSarro reported this contact to both his stepbrother, who nominally owned the club, and his wife.  The next morning, DiSarro's wife watched him get into a car she didn't recognize, but her description of the vehicle matched a car Frank Jr. sometimes used.  She never saw her husband again.

Over twenty years later, a Rhode Island excavator, who had been charged with committing various offenses, led law enforcement officials to a location in Rhode Island where they

unearthed DiSarro's remains.  Forensic examination revealed that DiSarro had been strangled.  The excavator's information also led to Robert DeLuca, a captain in the NELCN, who confessed that he had received DiSarro's body from Salemme with orders to dispose of it.  DeLuca reported that he had heard from Salemme that Weadick had driven DiSarro to Salemme's house, where Frank Jr. strangled DiSarro as Weadick held his legs, all in Salemme's presence.

DeLuca's information provided the breakthrough law enforcement had been looking for in investigating DiSarro's disappearance.  Eventually, the government initiated this case by indicting Salemme and Weadick for murdering DiSarro with the intent, at least in part, to prevent him from talking to federal authorities.  Frank Jr. had died by the time charges were filed.

At trial, Steven Flemmi -- a confessed murderer -- testified that he walked in on DiSarro's murder at Salemme's house as it was happening, just as DeLuca described it.  Weadick's girlfriend at the time of the murder testified that she had overheard Weadick and Frank Jr. expressing concerns that DiSarro "had a big mouth" right before the murder.  She also reported that Weadick left their apartment shortly thereafter and was in an agitated state when he returned.  He gave her a man's bracelet and told her that she would not need to worry about seeing DiSarro again.  Later, as they were driving south of Boston, Weadick told

her that a location they had passed would be a good place to bury
a body.

After twenty-three days of trial, the jury found both
defendants guilty.  This appeal followed.

## II.

Much of the evidence admitted against Salemme and
Weadick consisted of out-of-court statements made by other
individuals associated with NELCN activities.  Salemme and Weadick
each argue that various such statements were improperly admitted
under Federal Rule of Evidence 801(d)(2)(E) as statements by a
party's co-conspirator.  Weadick also contends that the admission
of certain out-of-court statements made by his co-defendant,
Salemme, violated his rights under the Confrontation Clause
because Salemme did not take the stand.

## A.

Federal Rule of Evidence 801(d)(2)(E) allows a court to
admit out-of-court statements by a party's co-conspirator if made
during the conspiracy and in furtherance of that conspiracy.  As
we apply the rule in this circuit, a party seeking to introduce a
statement under the rule must prove to the district court by a
preponderance of the evidence that:  (1) when the statement was
made, the declarant was a member of a conspiracy, (2) the defendant
was also (or later became) a member of the same conspiracy, and
(3) the statement was made in furtherance of that conspiracy.  See

United States v. Saccoccia, 58 F.3d 754, 778-79 (1st Cir. 1995).
We have dubbed the district court's determination as to whether
the proponent has satisfied this burden a "Petrozziello ruling,"
after our holding in United States v. Petrozziello, 548 F.2d 20
(1st Cir. 1977).  See United States v. Ciresi, 697 F.3d 19, 25
(1st Cir. 2012).  The district court may provisionally admit the
statement when it is introduced and defer a final Petrozziello
ruling until the close of evidence.  Id.  If the district court
decides at the close of evidence that one or more provisionally
admitted statements is inadmissible, the court must "give a
cautionary instruction to the jury, or, upon an appropriate motion,
declare a mistrial if the instruction will not suffice to cure any
prejudice."  United States v. Ciampaglia, 628 F.2d 632, 638 (1st
Cir. 1980).

        In accord with these procedures, the district court in
this case provisionally admitted several sets of out-of-court
statements against Salemme and Weadick and then, at the close of
evidence, issued a final Petrozziello ruling finding those
statements admissible under Rule 801(d)(2)(E).  Salemme and
Weadick challenge various aspects of that ruling on appeal.  As we
will note, some of those challenges were properly preserved, while
others were not.

**1.**

We begin by quickly disposing of Salemme and Weadick's general arguments that cover all the statements before moving to objections to specific sets of statements. First, Salemme and Weadick contend that it was improper for the district court to find that they were members of any conspiracy at all, given that neither of them was specifically charged with the crime of conspiracy. But the hearsay exception under Rule 801(d)(2)(E) can apply "regardless of whether the conspiracy furthered [by the alleged hearsay] is charged or uncharged and regardless of whether [the conspiracy] is identical to or different from the crime that the statements are offered to prove." United States v. Lara, 181 F.3d 183, 196 (1st Cir. 1999) (internal citations omitted). Therefore, whether preserved or not, this general argument fails.

Salemme and Weadick also complain that the district court abused its discretion by making a blanket Petrozziello ruling, finding that the Rule 801(d)(2)(E) standard was satisfied "with regard to all of the statements that were [provisionally] admitted under the co-conspirator exception" at once (emphasis added). They argue that the district court should instead have identified the particular conspiracy furthered by each challenged statement. But this argument ignores the fact that the district court explicitly gave Salemme and Weadick the opportunity to request additional findings. Neither defendant requested any

additional findings on the Petrozziello ruling, and Salemme
affirmatively indicated that he was not making any such request.[1]
Having thus assured the court that no more specific findings were
needed or requested, defendants cannot now complain that the
district court's ruling was too general.  See United States v.
Medina, 427 F.3d 88, 91 (1st Cir. 2005); see also United States v.
Castellini, 392 F.3d 35, 50 (1st Cir. 2004) (rejecting a procedural
argument that the district court "never made explicit findings
regarding the existence of the conspiracy and whether the
statements were made in furtherance of the conspiracy" where the
defendant "did not ask the court to be more specific").  Their
second general argument to the district court's Petrozziello
rulings therefore also fails.

**2.**

We turn now to the specific statements whose admission
Salemme and Weadick challenge under Rule 801(d)(2)(E).  Salemme
directs us first to a portion of the trial transcript containing
a recorded conversation in which Frank Jr. brags about several

---

[1] During a conference on jury instructions prior to the
district court's final ruling on the Petrozziello objection,
Weadick challenged the scope of the conspiracy upon which the
Petrozziello finding rested, but only to the extent it covered the
statements made prior to 1989, when the acquisition of the
nightclub was first pursued.  The trial court seemed to agree with
Weadick that the evidence only supported a finding that he
participated in the alleged conspiracy after 1989, and it noted
that the pre-1989 statements came in through other means rather
than through the co-conspirator exception.

exploits and successes by him and his father.  Because Salemme made no relevant objection to this testimony at trial, we would ordinarily review the belatedly challenged admission of the testimony only for plain error,  see United States v. Sandoval, 6 F.4th 63, 92 (1st Cir. 2021), but Salemme waives even that review by offering no explanation at all for how the testimony prejudiced him.  See Pabon, 819 F.3d at 29 (finding a defendant's argument waived because he "made no attempt" to show how he carried his plain error burden).

        Salemme directs us to only one other specific instance of error in allowing testimony under the co-conspirator exception: testimony by Thomas Hillary (a person indebted to Salemme) that DiSarro said he could not loan Hillary any money because Salemme would kill him if he did.  Again, Salemme made no timely objection was made at trial, so we review for plain error.  Because the record otherwise supported the charge that Salemme had helped kill DiSarro to silence him, the evidence was independently admissible under Federal Rule of Evidence 804(b)(6).  See United States v. Houlihan, 92 F.3d 1271, 1281-82 (1st Cir. 1996) (hearsay objection waived by homicide); see also Giles v. California, 554 U.S. 353, 367 (2008) (noting that Rule 804(b)(6) codified the forfeiture-by-wrongdoing doctrine).  Thus, any potential error on this point was harmless.  See United States v. Barone, 114 F.3d 1284, 1296-97 (1st Cir. 1997) ("[W]e may affirm the district court's

evidentiary rulings on any ground apparent from the record on appeal.").

For his part, Weadick points us to five sets of statements that he says were admitted over his timely objection on hearsay grounds. Given that Weadick's counsel made several statements that might be construed as timely objections, and that he "noted [Weadick's] objections" to the district court's Petrozziello findings at the close of evidence, we give Weadick the benefit of the doubt and review the admission of these five sets of statements for abuse of discretion, see United States v. Delgado-Marrero, 744 F.3d 167, 179 (1st Cir. 2014), keeping in mind that "[w]e may not disturb the verdict if [an] error was harmless," id. at 207 (citing Fed. R. Evid. 103(a) and Fed. R. Crim. P. 52(a)).

The first two sets of challenged statements involved Salemme blaming others (including Flemmi) for DiSarro's murder, which Weadick contends could not have been made in furtherance of a conspiracy involving him and thus were impermissible hearsay. But the government did not offer those statements to prove that they were true. See Fed. R. Evid. 801(c)(2). To the contrary, the government contended that they were obviously false, and for

that reason evidenced Salemme's consciousness that he was guilty of something that needed to be blamed on others.[2]

The third set of statements Weadick challenges came from an intercepted recording of a conversation between Salemme and Natale Richichi, a member of the Gambino family of New York, during a 1991 meeting at a Hilton Hotel in Boston. The transcript of the recording reveals that Richichi and Salemme discussed DiSarro owing someone money. During that discussion, Salemme said that he told his son, "DiSarro is gonna turn on you, he's a snake, he's a sneak, he's no fuckin' good." Weadick contends that these statements were not in furtherance of any conspiracy that he was a part of, while the government maintains that these statements were in furtherance of a conspiracy between Weadick and Salemme because the discussion was apparently aimed at getting Richichi's support for Salemme as leader of the NELCN. Whatever one makes of these statements, their admission caused no material harm. Weadick argues only that the statements were prejudicial because they revealed Salemme's disdain for DiSarro. But plenty of evidence in the record echoed these same sentiments, including one witness's testimony that Salemme believed DiSarro was stealing from the

---

[2] The government also admitted as to Salemme a plea agreement in which Salemme admitted to lying when he tried to blame DiSarro's murder on a person named Nicky Bianco. Weadick expressly waived any objection to that evidence, albeit preserving his spillover argument, which we address later in this opinion. See infra Part IV.A.

nightclub and another witness's testimony that DiSarro believed Salemme was "crazy" and was "going to kill" him.

The fourth set of statements came from an audiotaped conversation of Frank Jr. talking to another individual in 1990. In it, Frank Jr. explained that he was in the process of acquiring the nightclub. He also mentioned collecting illicit payments in exchange for providing protection of some sort. Weadick again argues that these statements were not in furtherance of a conspiracy he was a part of. But given the collateral and attenuated substance of these conversations, which had little if any link to Weadick, it is highly improbable that these statements influenced the verdict. Accordingly, any potential error was harmless.

The fifth -- and potentially most prejudicial -- set of statements relates to two conversations between Salemme and Robert DeLuca. For context, DeLuca testified that on the day of the murder, Salemme told him to have "a hole dug" because Salemme would be delivering him "a package." The next day, DeLuca received the "package," a dead body wrapped in a blue tarp. The day after that, Salemme told DeLuca that Frank Jr. had strangled and killed DiSarro, and that Flemmi had walked in, coincidentally, during the murder. Then came the challenged statements: DeLuca testified that, a couple weeks later, Salemme told him that law enforcement had contacted Weadick about DiSarro's murder. When DeLuca asked

about Weadick's involvement, Salemme responded that Weadick had taken DiSarro to the house where he was murdered and held his legs while Frank Jr. strangled him.  Sometime later, when DeLuca and Salemme were incarcerated together, Salemme said that law enforcement had gone to see Weadick again but that Weadick would "stand" (i.e., not talk).

Weadick maintains that the statements tying him to the murder were not made during or in furtherance of a conspiracy involving him and Salemme because they were "made weeks and months after the conspiracy to kill DiSarro had concluded" and provided "no significant benefit" to the members of that conspiracy.  This argument might have more pull if the district court had determined that Weadick was only part of a conspiracy to murder DiSarro, and not part of some other conspiracy with Salemme.  That is because a conspiracy endures only "as long as the co-conspirators endeavor to attain the 'central criminal purposes' of the conspiracy," United States v. Berroa, 856 F.3d 141, 155 (1st Cir. 2017) (quoting United States v. Upton, 559 F.3d 3, 10 (1st Cir. 2009)), and "[m]ere efforts to conceal a crime do not automatically extend the life of the crime itself," unless "the proof shows 'an express original agreement among the conspirators to continue to act in concert in order to cover up' their crime," United States v. Twitty, 72 F.3d 228, 233 (1st Cir. 1995) (quoting Grunewald v. United States, 353 U.S. 391, 404 (1957)).

But the district court's Petrozziello ruling was not so
narrow, and the record supports a finding that a larger, ongoing
NELCN conspiracy existed. See United States v. Marino, 277 F.3d
11, 26 (1st Cir. 2002) (explaining that membership in the same
crime family with common goals can establish a conspiracy, even if
"organized crime membership alone" does not (quoting United States
v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999))). Salemme's statements
to DeLuca were plainly made "in furtherance" of that larger
conspiracy. Salemme informed DeLuca of Weadick's involvement in
the murder to reassure DeLuca that, despite being questioned by
law enforcement, Weadick would not expose them. We have previously
held that statements keeping co-conspirators "abreast of current
developments and problems facing the group" or "provid[ing]
reassurance" are in furtherance of a conspiracy. Ciresi, 697 F.3d
at 29-30.

And the record supports the conclusion that Weadick was
a member of the larger NELCN conspiracy. Simply put, it seems
quite unlikely that Weadick would work scams with Frank Jr. backed
by the threat of the NELCN muscle, have access to the club's books
while managing it as a front for NELCN leadership, and participate
with Salemme himself in the murder of a threat to NECLN, all
without himself having signaled his support of the criminal
conspiracy known as NELCN. Cf. United States v. Azubike, 564 F.3d
59, 65 (1st Cir. 2009) ("[D]rug organizations do not usually take

- 15 -

unnecessary risks by trusting critical transactions to outsiders."
(quoting United States v. Azubike, 504 F.3d 30, 37 (1st Cir.
2007))). Although several people associated with the NELCN
testified that they did not know Weadick, "each coconspirator need
not know of or have contact with all other members." United States
v. Cortés-Cabán, 691 F.3d 1, 13 (1st Cir. 2012) (quoting United
States v. Martínez-Medina, 279 F.3d 105, 113 (1st Cir. 2002)). We
therefore find no abuse of discretion in the district court's
Petrozziello ruling admitting Salemme's statements to DeLuca.

### B.

Weadick next contends that the statements we just
discussed -- the statements Salemme made to DeLuca -- raise a
problem under Bruton v. United States, 391 U.S. 123 (1968). Bruton
held that the introduction at trial of statements made by a non-
testifying co-defendant violates a defendant's Sixth Amendment
right to confront the witnesses against him if the statements
"facially incriminate" the defendant. United States v. Figueroa-
Cartagena, 612 F.3d 69, 85 (1st Cir. 2010). But not all such
statements implicate the Sixth Amendment; only "testimonial" ones
do. Davis v. Washington, 547 U.S. 813, 821 (2006). And the
Supreme Court has explained that "statements in furtherance of a
conspiracy" are "by their nature . . . not testimonial." Crawford
v. Washington, 541 U.S. 36, 56 (2004). Thus, Bruton "does not bar
the use of a co-conspirator statement made in furtherance of the

conspiracy and admissible under a traditional hearsay exception." United States v. De La Paz-Rentas, 613 F.3d 18, 29 (1st Cir. 2010). Since we have held that the district court did not abuse its discretion in admitting Salemme's statements to DeLuca under the co-conspirator exception to hearsay, the admission of those statements poses no Bruton problem.

### III.

Weadick and Salemme make several challenges to the jury instructions. Because neither defendant made a timely objection to the relevant instructions, see Fed. R. Crim. P. 30(d), we review only for plain error, see United States v. McPhail, 831 F.3d 1, 9 (1st Cir. 2016).

### A.

Weadick and Salemme each challenge an instruction by the district court addressing the element of motive. Weadick also argues that there was insufficient evidence of his intent to support his conviction.

### 1.

The statute under which the defendants were charged makes it a crime to kill someone "with intent to . . . prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . ." 18 U.S.C. § 1512(a)(1)(C). Obviously, as here, when the killing is achieved

as intended, no actual communication takes place.  So the trial
judge decided to instruct the jury that the communication that was
prevented by the killing need only have been "possible."
Specifically, the trial judge instructed the jury that the
government bore the burden of proving "beyond a reasonable doubt
that at least some part of a defendant's motive in killing Steven
DiSarro was to prevent a communication or possible communication
to a federal officer or judge" (emphasis added).

      Weadick and Salemme argue that the government was
required to prove a "reasonable likelihood" that DiSarro would
have made a communication of concern, and that the district court
erred by instructing the jury that the relevant communication need
only have been "possible."  They rely chiefly on the Supreme
Court's opinion in United States v. Fowler, 563 U.S. 668 (2011).
But Fowler addressed a different question:  When a defendant kills
a person to prevent the person from talking with law enforcement
officials generally, rather than federal officials specifically,
is there a violation of the federal witness tampering law?  563
U.S. at 670.  Relying in part on the need to have a federal nexus
so as not to federalize the treatment of witness tampering in run-
of-the-mill state law matters, id. at 677, the Court held that the
federal witness tampering statute requires the government to prove
a "reasonable likelihood" that "at least one of the relevant
communications would have been made to a federal officer," id. at

677-78.  In this case, the evidence clearly meets that standard: Salemme and Weadick first expressed concern after a federal agent sought cooperation from DiSarro, and his death occurred the day after he reported a second contact from a federal agent.

Still, Weadick and Salemme argue, perhaps DiSarro would not have made any communication at all.  Whether Fowler's "reasonable likelihood" standard applies equally to that issue is unclear.  We have not considered the question previously, but two circuits that have considered it have concluded that Fowler does not apply.  See United States v. Tyler, 956 F.3d 116, 127 n.15 (3d Cir. 2020); Stuckey v. United States, 603 F. App'x 461, 461-62 (6th Cir. 2015).  Accordingly, Weadick and Salemme have not established plain error.  See United States v. Rivera-Morales, 961 F.3d 1, 13 (1st Cir. 2020) ("[A] criminal defendant generally cannot show that a legal error is clear or obvious in the absence of controlling precedent resolving the disputed issue in his favor.").

**2.**

Relatedly, Weadick argues that the government did not provide sufficient evidence of his intent to prevent a communication with a federal law enforcement officer or judge.  He says that, even assuming there was sufficient evidence that he assisted in murdering DiSarro, there was no evidence that he did so with the specific intent of preventing DiSarro from becoming a

federal witness. The district court denied Weadick's Rule 29 motion on this point. See United States v. Salemme, No. 16-CR-10258-ADB, 2018 WL 3429909, at *2 (D. Mass. July 16, 2018). We review that denial de novo, asking "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. Martínez-Mercado, 919 F.3d 91, 98 (1st Cir. 2019) (quoting United States v. George, 841 F.3d 55, 61 (1st Cir. 2016)). In doing so, however, we decline to weigh the evidence or make credibility judgments, as those tasks fall "solely within the jury's province." United States v. Acevedo, 882 F.3d 251, 259 n.8 (1st Cir. 2018) (quoting United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000)).

Here, a reasonable jury could have found that Weadick killed DiSarro with the specific intent to prevent him from speaking with federal law enforcement officers. Weadick's girlfriend at the time testified that she dated and lived with him for over a year and that she heard Weadick and Frank Jr. talk about "law enforcement quite a bit and their concern about it." She also testified that, at one point, Weadick "had gotten quite angry" at DiSarro because DiSarro "had a big mouth" and "was talking about things he shouldn't be." She further testified that Weadick was

also involved in conversations where the participants said that DiSarro was "probably worried that someone's going to kill him because of the way he's talking, running his mouth."  Finally, DiSarro's murder occurred the morning after a second federal agent contacted him, and after Weadick had already expressed concerns about DiSarro implicating the Salemmes.  That chronology added yet another basis for inferring that DiSarro was murdered precisely to keep him from caving into pressure from law enforcement.

A rational factfinder also could have found a reasonable likelihood that the communication Weadick intended to prevent would have been made to one or more <u>federal</u> law enforcement officers.  <u>See</u> <u>Fowler</u>, 563 U.S. at 678.  As we have already explained, it is at least reasonably likely that any relevant communication made by DiSarro would have been directed to the federal agents who had recently sought his cooperation.  We therefore see no error in the district court's denial of Weadick's Rule 29 motion.

**B.**

At the end of trial, both defendants asked the court to instruct the jury on the elements of the offense of being an accessory after the fact.[3]  The theory was that if the jurors

---

[3] An accessory after the fact is a person "who helped the principal after the basic criminal event took place."  <u>See</u> <u>Figueroa-Cartagena</u>, 612 F.3d at 73 (quoting <u>Gonzales</u> v. <u>Duenas-Alvarez</u>, 549 U.S. 183, 189 (2007)); 18 U.S.C. § 3.

disbelieved most of the government's evidence, but believed some of what DeLuca said about Salemme's effort to have the body buried, then Weadick or Salemme was guilty only of being an accessory after the fact, not of committing or aiding and abetting a murder. The district court refused to give the instruction, and Salemme challenges that refusal on appeal. Despite Salemme requesting this instruction with specificity and the district court rejecting his request on the merits, our review under current circuit precedent is still for plain error because Salemme failed to object after the jury was charged. See McPhail, 831 F.3d at 9. But see United States v. Pérez-Rodríguez, No. 19-1538, 2021 WL 3928896, at *20-22 (1st Cir. Sept. 2, 2021) (Lipez, J., concurring). That being said, as we will explain, the standard of review makes no difference in this instance because there was no error.

A defendant "is ordinarily entitled to a lesser-included charge" or an instruction for a complete defense if doing so is "consistent with the evidence." United States v. Rivera-Figueroa, 149 F.3d 1, 6 (1st Cir. 1998) (citing Schmuck v. United States, 489 U.S. 705, 715-16 & n.8 (1989)). But, as the district court correctly noted, being an accessory after the fact is neither a complete defense to the charged crime nor a lesser-included offense. See id. at 6 n.5. And as we have previously observed, giving an instruction on an uncharged accessory-after-the-fact offense poses a risk of confusing the jury. United States v.

- 22 -

Otero-Méndez, 273 F.3d 46, 56 (1st Cir. 2001).  Under these
circumstances, a defendant cannot establish an abuse of discretion
(let alone plain error) unless, among other things, he can show
that the "requested instruction was essential to the effective
presentation of the particular defense."  See id. at 55 (quoting
United States v. Rosario-Peralta, 199 F.3d 552, 567 (1st Cir.
1999)).  Salemme makes no such showing.  Indeed, any claim that
Salemme helped out afterward would have likely undercut his
defense, which was that he took no part in the killing at all.
All in all, we agree with the district court that it was not
necessary to instruct the jury as to the elements of being an
accessory after the fact.

Salemme also makes a separate, slightly different
argument on appeal.  He contends that the district court, in
instructing on aiding-and-abetting liability, should have added a
warning that helping a perpetrator only after the fact was not
aiding and abetting.  Salemme never raised this particular argument
in the district court.  And even on appeal he does not dispute
that the instruction given clearly set out the elements of aiding
and abetting.  Nor does he show that it was clear or obvious that
the requested instruction was necessary to his defense.  We
therefore reject this argument for the lack of any plain error.

**IV.**

Finally, we turn to several miscellaneous, allegedly prejudicial errors Weadick and Salemme argue were made by the district court.  We discuss each in turn.

**A.**

Weadick challenges the district court's denial of his motion to sever.  We review that denial only for an abuse of discretion.  United States v. Azor, 881 F.3d 1, 10 (1st Cir. 2017).  Weadick contends that severance was necessary to avoid evidentiary spillover.  Evidentiary spillover occurs "where evidence establishing the guilt of one defendant, but not admissible [sic] against the other, may create an atmosphere clouding the jury's ability to evaluate fairly the guilt or innocence of the latter."  United States v. Perkins, 926 F.2d 1271, 1281 (1st Cir. 1991); see also United States v. Martínez, 994 F.3d 1, 15–16 (1st Cir. 2021) (describing spillover as "where the crimes of some defendants are more horrific or better documented than the crimes of others" (quoting United States v. Innamorati, 996 F.2d 456, 469 (1st Cir. 1993))).

Some amount of spillover is inherent in trying multiple defendants together.  See United States v. DeLuca, 137 F.3d 24, 36 (1st Cir. 1998).  "To prevail on an evidentiary spillover claim, the defendant must prove 'prejudice so pervasive that a miscarriage of justice looms.'"  United States v. Paz-Alvarez, 799 F.3d 12, 30

(1st Cir. 2015) (quoting United States v. Levy-Cordero, 67 F.3d
1002, 1008 (1st Cir. 1995)).   "[W]here the evidence against a
defendant might show [his] association with his co-defendants even
if he were tried alone, the argument for prejudice becomes much
weaker."  Azor, 881 F.3d at 12 (citing King v. United States, 355
F.2d 700, 704 (1st Cir. 1966)).   "Even where large amounts of
testimony are irrelevant to one defendant, or where one defendant's
involvement in an overall agreement is far less than the
involvement of others, we have been reluctant to secondguess
severance denials."  Id. (quoting United States v. Boylan, 898
F.2d 230, 240 (1st Cir. 1990)).

       With these principles in mind, we turn to Weadick's
arguments.  First, echoing his earlier contention that he was not
a member of any conspiracy with Salemme or the NELCN beyond
arguably a narrow conspiracy to murder DiSarro, Weadick contends
that a number of co-conspirator statements admitted against
Salemme at trial would not have been admissible against him in a
separate trial.  However, as we have already explained, the
specific statements Weadick points to, with one exception, were
either equally admissible against him or harmless.  See supra
Part II.A.  As such, the admission of these statements did not
require severance.  See United States v. Floyd, 740 F.3d 22, 37
(1st Cir. 2014) (explaining that there was no plausible basis for
severance where "[m]uch of the evidence about which the defendants

complain would have been admissible against them even if they had
been tried separately").

        The one exception is Salemme's admission that he lied
when he claimed that a third party was responsible for DiSarro's
murder in his 1999 proffer to the government, which was admissible
against Salemme alone.  But, like the statements just discussed,
Salemme's admission did not create the sort of "extreme prejudice"
that would warrant a separate trial for Weadick.  Houlihan, 92
F.3d at 1295.  The district court made clear during jury
instructions, and Weadick argued in closing, that the jury was
free to convict Salemme and acquit Weadick.  See United States v.
Capelton, 350 F.3d 231, 239 (1st Cir. 2003) (upholding the denial
of a severance motion in part because the district court instructed
the jury to evaluate each defendant individually).  Salemme's
admission did not change that.  It was offered only to show
Salemme's consciousness of guilt, and it did not mention Weadick
or otherwise implicate him in DiSarro's murder.  Certainly someone
killed DiSarro and had him buried, so evidence that implicated
Salemme, and not Weadick, was a mixed bag at worst for Weadick.
And given the testimony of Weadick's girlfriend, of Flemmi, and of
DeLuca, as well as the evidence of Weadick's relationship with
Frank Jr., it is very unlikely that Salemme's admitted lying made
any difference.  See United States v. Appolon, 695 F.3d 44, 54
(1st Cir. 2012) (requiring a defendant moving to sever to show

"more than just a better chance of acquittal at a separate trial" (quoting United States v. DeCologero, 530 F.3d 36, 52 (1st Cir. 2008))).

Second, Weadick argues that he was prejudiced by the introduction of certain witnesses' prior crimes. For example, Flemmi testified to his involvement in the murders or attempted murders of over a dozen individuals. Weadick asserts that he was prejudiced by the sheer volume of prior-acts evidence, as well as by the brutal detail elicited regarding two murders in particular -- one that took place at Salemme's house in Flemmi's presence, see infra Part IV.C, and another that Salemme ordered DeLuca to commit.

Salemme does not challenge the admissibility of this testimony. Indeed, he elicited some of it himself in what Weadick presumes was an actual or anticipated attempt to impeach the witnesses. Weadick, though, points out that some of the evidence of murders predated his earliest possible involvement in any NELCN conspiracy and was prejudicial spillover evidence that never would have been admitted had he been tried alone. We are skeptical. It would be an unusual defendant who would not want the jury to know that the government's key witness is a murderer many times over.

Be that as it may, even if we assume that Weadick -- unlike Salemme -- would not have impeached Flemmi, et al. with their prior crimes, a divergence in defense strategy generally

poses no mandatory severance absent a true antagonism, "such that if the jury believe[d] one defense, it [was] <u>compelled</u> to convict the other defendant." <u>United States</u> v. <u>Peña-Lora</u>, 225 F.3d 17, 33 (1st Cir. 2000) (emphasis in original) (quoting <u>United States</u> v. <u>Woods</u>, 210 F.3d 70, 79 (1st Cir. 2000)).  Clearly, no such antagonism existed here.  With or without the impeachment, both defendants took the position that Flemmi was not to be believed, and neither sought to use the evidence (or its absence) to point the finger at the other.  At most, we have an example of a disagreement in how best to use (or not use) evidence toward a shared end, and Weadick's inability to pursue his preferred tactic is unlikely to have caused any cognizable harm.  See <u>DeCologero</u>, 530 F.3d at 53.

Finally, as to prejudice, precisely because the testimony did not concern Weadick, its prejudicial impact was muted.  We do agree that in painting Salemme and his associates so badly, the testimony created some risk of guilt by association. But evidence plainly admissible against Weadick already made clear that Weadick was close to the Salemmes and they were very bad guys. The district court, too, told the jury that it could acquit Weadick while convicting Salemme, and that it could not use evidence of any prior crimes to establish a propensity to commit the charged crime.  All in all, we find no error of law or abuse of discretion in holding a single trial to adjudicate the charges that Weadick

and Salemme together murdered DiSarro to keep him from talking
with federal authorities.

**B.**

Weadick next says the district court erred in allowing
the government to introduce evidence showing that, prior to
DiSarro's murder, he and Frank Jr. had worked together to con drug
dealers and users.  He argues that this evidence was irrelevant,
<u>see</u> Fed. R. Evid. 402, that it amounted to improper propensity
evidence, <u>see</u> Fed. R. Evid. 404(b), and that, in any event, its
probative value was outweighed by the risk of unfair prejudice it
posed, <u>see</u> Fed. R. Evid. 403.  Assuming a proper objection was
made, we review for abuse of discretion.  <u>Grossmith</u> v. <u>Noonan</u>, 607
F.3d 277, 279 (1st Cir. 2010).

The evidence Weadick challenges includes testimony from
a witness with NELCN connections that Frank Jr. and Weadick "robbed
together."  Another witness, a former officer for the New Hampshire
State Police, testified that while he was undercover posing as a
prospective seller of cocaine in 1987, Weadick and Frank Jr.
approached him about buying drugs.  He testified that they became
uninterested and left when the officer told them that he did not
have the drugs in the car and that they would have to go to another
location to get them.  Other troopers later stopped Weadick and
Frank Jr.'s vehicle and searched the car for money.  Although no
money was found, the officers found a package of flour, wrapped

tightly in tape, which the officer testified was roughly the size and bulk of the amount of money they would have been dealing with. Finally, a third witness, DiSarro's stepbrother, testified that DiSarro had told him that Weadick and Frank Jr. had "ripped off a drug dealer and then pushed him out of the car while it was going down the road."

We see no abuse of discretion in the district court's finding that the drug-transaction evidence was admissible against Weadick.  Rule 404(b) prohibits the use of evidence of "any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  For example, if the drug-con evidence had been offered solely to suggest that Weadick was a criminal and was therefore more likely to have committed the charged crime, the evidence would be inadmissible under Rule 404(b).  But that is not what happened here.  Rather, the drug-con evidence was admitted "to help the jury understand the basis for the co-conspirators' relationship of mutual trust," which in turn would help it evaluate whether and why Weadick might have agreed to help Frank Jr. murder DiSarro.  United States v. Escobar-de Jesus, 187 F.3d 148, 169 (1st Cir. 1999).  That is a relevant and permissible purpose in a conspiracy

case such as this.[4]  Id.; see also United States v. Vizcarrondo-
Casanova, 763 F.3d 89, 94 (1st Cir. 2014).

It is true that the government likely could have
introduced other evidence establishing a relationship between
Weadick and Frank Jr.  But, as the district court pointed out, the
drug-con evidence was the only evidence showing that their
relationship included criminal activities, which strengthens the
inference of loyalty and mutual trust and shows that Weadick's
involvement in the Salemme family's crimes was not limited to
DiSarro's murder.  And any danger of unfair prejudice stemming
from this evidence was low:  The drug cons that Weadick allegedly
participated in with Frank Jr. were not similar to the charged
crime of murder, and they were far less serious.  Moreover, the
details elicited regarding the drug cons were not excessive.  See
Vizcarrondo-Casanova, 763 F.3d at 94-95 (asking whether the
evidence of this type included more details than necessary to
establish trust and whether the government had other evidence to
establish a relationship of trust).  As such, the district court
did not abuse its discretion in finding that the probative value
of this evidence was not substantially outweighed by the danger of
unfair prejudice or other related concerns.  See Fed. R. Evid. 403;

---

[4]  We therefore need not address the district court's
alternate basis for admitting the drug-con evidence under
Rule 404(b), namely that it was "intrinsic to the charge[d]
conspiracy."

Martínez-Mercado, 919 F.3d at 101 (explaining that Rule 404(b) requires a determination as to whether (1) the evidence has a non-propensity purpose, and if so, (2) the probative value of the evidence is substantially outweighed by the danger of unfair prejudice).

Pushing back, Weadick argues that the government's evidence showing his involvement in the drug scams was weak. For example, he notes that on cross-examination, one witness admitted that he only "vaguely" remembered the Weadick drug robberies and that he could not remember specifics. Likewise, DiSarro's stepbrother on cross-examination admitted that he could not recall for certain whether Weadick was involved in the cons and that he may have been wrong in saying he had been. Weadick also points out that some law enforcement officers who conducted surveillance of Frank Jr. never observed Weadick with him -- implying that Weadick and Frank Jr. were not as close as the other evidence made it seem or that the witnesses testifying to Weadick's involvement in the drug cons were mistaken. But all these arguments go to the weight of the evidence, not to its admissibility. See United States v. Mehanna, 735 F.3d 32, 65 (1st Cir. 2013).

### C.

Salemme challenges on propensity grounds the introduction of Flemmi's testimony that he was with Salemme at Salemme's home in 1968 when another person was murdered. Salemme

points to no indication that he objected to this evidence, so we review only for plain error. It is not obvious that the evidence had no non-propensity relevance and purpose -- it explained why Salemme would not have been concerned when Flemmi stumbled upon Salemme, Frank Jr., and Weadick committing the DiSarro murder. See Escobar-de Jesus, 187 F.3d at 169 (allowing evidence of a prior crime to help demonstrate a relationship of mutual trust). The evidence also had a potential for unfair prejudice given certain similarities between Flemmi's testimony and the DiSarro murder. But there is no reason to treat as plain error the district court's balancing of these attributes in favor of admitting the evidence.[5]

**D.**

Lastly, Weadick argues that the prosecutor committed Napue error by failing to correct allegedly false testimony a witness gave during the trial. In Napue v. Illinois, the Supreme Court held that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," including when "the State, although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. 264, 269 (1959).

---

[5] Although the district court at the end of trial concluded this evidence was intrinsic to the charged crime, we may affirm a district court's evidentiary ruling on any ground apparent in the record. See United States v. Brown, 669 F.3d 10, 21 (1st Cir. 2012).

Weadick focuses on DeLuca's testimony that Salemme had told him DiSarro "was an informant" who "was giving information to" an Assistant United States Attorney.  Weadick asserts that "DiSarro never communicated with [that Assistant] at any time prior to his death."  But that is beside the point.  As the government explained to the jury, this testimony from DeLuca was elicited only to show that Salemme <u>believed</u> DiSarro was cooperating with federal authorities:

> Now, was Steven DiSarro actually cooperating with the federal government?  No.  No.  But it doesn't matter because to satisfy the element of this offense, all the government needs to show is that the defendant is motivated by his belief . . . that the person is a cooperator.

Weadick does not dispute that Salemme in fact expressed such a belief, accurate or not, to DeLuca.  Accordingly, we reject his claim of <u>Napue</u> error.

## V.

For the foregoing reasons, we <u>affirm</u> the convictions of both Salemme and Weadick.